# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEAN AULD, DANIEL ENRIQUEZ, RYAN MEUSE, AND EDGAR NAVA, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL PLAYERS ASSOCIATION; ONETEAM PARTNERS, LLC,<br><br>*Defendants*. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Sean Auld, Daneil Enriquez, Ryan Meuse, and Edgar Nava ("Plaintiffs"), on behalf of themselves and all others similarly situated, upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint against Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, and Fanatics Holdings, Inc. (collectively, "Fanatics"); Major League Baseball ("MLB"); Major League Baseball Properties, Inc. ("MLBP"); Major League Baseball Players Association ("MLBPA");

MLB Players, Inc. ("MLBPI"); National Football League ("NFL"); NFL Properties LLC ("NFLP"); National Football League Players Association ("NFLPA"); NFL Players Inc. ("NFLPI"); National Basketball Association ("NBA"); NBA Properties, Inc. ("NBAP"); National Basketball Players Association ("NBPA"); and OneTeam Partners, LLC ("OneTeam") (collectively, "Defendants"), for violations of federal and state laws, seeking actual damages, treble damages, disgorgement of profits, injunctive relief, reasonable costs and attorneys' fees, and pre- and post-judgment interest.

## I.     NATURE OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of themselves and all other similarly situated persons and entities in the United States who, at any time from January 1, 2022 until such time as the anticompetitive conduct alleged herein ceases (the "Class Period"), purchased from a non-Defendant not for resale, newly issued, fully licensed MLB, NFL, and NBA (collectively referred to as the "Major U.S. Professional Sports Leagues" or the "Leagues") trading cards produced by Fanatics.

2.     Defendants have engaged in an anticompetitive scheme in the market for newly issued, fully licensed Major U.S. Professional Sports Leagues trading cards ("Pro Sports Trading Cards") produced by Fanatics resulting in inflated prices and reduced competition for purchasers of such cards.

3.     Pro Sports Trading Cards featuring professional athletes are valued both as collectibles and as investments, creating a thriving and competitive market. To effectively compete in this market, manufacturers must obtain licenses from both professional sports players associations to use the names, images, and likenesses of players, and from professional sports leagues to use the names, logos, and uniforms of the players' teams.

4.     Historically, licenses from professional sports leagues and professional sports

2

players associations were awarded through a public bidding process resulting in non-exclusive license agreements or in exclusive license agreements typically of five years or less, and with staggered terms, wherein no single licensee controls exclusive rights across all of Major U.S. Professional Sports Leagues and players associations at once.

5.      Beginning in August 2021, Fanatics announced the acquisition of the leading professional sports licenses in North America: professional baseball from the MLB and the MLBPA; professional men's basketball from the NBA and the NBPA; and professional football from the NFL and the NFLPA (MLBPA, NBPA, and NFLPA are referred to collectively as the "Players Associations"). Thus, for the first time, one licensee, Fanatics, secured exclusive licenses across all six Major U.S. Professional Sports League licensors.

6.      Fanatics obtained long-term exclusive licenses—at least 10 years, and in most cases, 20 years—by promising Major U.S. Professional Sports Leagues and Players Associations an equity stake in its future monopoly profits in exchange for those long-term exclusive licenses. Fanatics made these deals with all Major U.S. Professional Sports Leagues and Players Associations, eliminating competitors and securing monopoly power. These were "back room" deals, accomplished without any open bidding process.

7.      In January 2022, Fanatics acquired Topps, which was the dominant producer of MLB player trading cards, and which had an exclusive license with MLB until 2025 and a semi-exclusive license with the MLBPA through 2022. By acquiring Topps, Fanatics eliminated one of its major competitors and gained immediate dominance of the market for MLB player trading cards.

8.      Fanatics also acquired a controlling stake in GC Packaging ("GCP"), an essential trading card manufacturer that serves as the primary supplier for Fanatics' sole

remaining Pro Sports Trading Cards competitor, Panini America Inc. ("Panini"). Following the acquisition, Fanatics restricted GCP's production to choke off Panini's supply, causing supply disruptions and contract cancellations. GCP provides highly specialized manufacturing services, and Panini views GCP as the only facility capable of meeting its technological, quality, and capacity requirements. GCP fulfills over 90% of Panini's production needs.

9.      Thereafter, Fanatics began leveraging its unlawfully acquired exclusive license agreements with the Leagues and Players Associations, using threats and false statements to poach dozens of Panini's employees, further undermining Panini's ability to compete. For example, Fanatics threatened to block Panini employees from working in the industry once Fanatics' exclusive long-term licenses took effect unless they immediately quit Panini and joined Fanatics.

10.      Fanatics strong-armed athletes into entering into exclusive agreements with it and/or refusing to do business with its rival Panini, using a similar combination of payoffs and threats. For example, Fanatics threatened that players would never get an autograph deal when Fanatics' long-term contracts took effect in the future unless they immediately signed with Fanatics. With respect to NFL and NBA player trading cards, Fanatics did not contemporaneously produce trading cards on which these autographs could be placed. In effect, Fanatics paid players not to provide autographs of the most important player Pro Sports Trading Cards for the NFLA and NBA during the critical early years of their careers.

11.      Fanatics spread false statements about Panini's business and pressured distributors, retailers, and "case breakers" to cut ties with Panini, declaring that—after the anticompetitive campaign Fanatics itself had orchestrated—Panini was now, "dead." For example, Fanatics told players, agents, and players associations that Panini would soon lose all

licensing rights, go bankrupt, and be unable to fulfill its financial and contractual obligations to athletes.

12.    Fanatics, which separately has a monopoly over sales of Major U.S. Professional Sports League jerseys and memorabilia, has used its monopoly to block all other Pro Sports Trading Cards manufacturers from acquiring the jerseys necessary for production of some of the most valuable Pro Sports Trading Cards, which integrate a piece of a player's jersey into that player's trading card. Prior to May 2023, Panini had a multi-year business relationship with Fanatics for the purchase of player jerseys for use in trading cards; it was only after Fanatics entered the Pro Sports Trading Cards market that Fanatics terminated sales of jerseys to Panini.

13.    Fanatics has used its monopoly power to control the distribution of Pro Sports Trading Cards to big-box retailers and other major retail outlets. After securing its exclusive licensing deals and acquiring Topps, Fanatics pressured distributors that supply Pro Sports Trading Cards to major retailers to give Fanatics higher margins on the cards. If the distributors refused to comply, Fanatics threatened to cut them off entirely from the supply of Pro Sports Trading Cards.

14.    At the same time, Fanatics also renegotiated terms directly with big-box retailers requiring them to carry a more limited range of Pro Sports Trading Cards products, severely limiting those cards not manufactured or distributed by Fanatics. By doing so, Fanatics reduced the overall variety of Pro Sports Trading Cards available to consumers at major retail outlets, further limiting consumer choice.

15.    Fanatics also leveraged its monopoly power to impose anticompetitive terms on local trading card shops. Fanatics' control over the market allowed it to dictate the terms under

which local trading card shops could sell its products, even though these shops had previously operated with greater autonomy. Fanatics used this control to harm competition and limit consumer choice by forcing local trading card shops to accept restrictive terms or risk being cut off from the supply of highly sought-after Pro Sports Trading Cards.

16.     Fanatics distributed contracts to local trading card shops with terms that allowed Fanatics to unilaterally set minimum prices for its Pro Sports Trading Cards at any time. While Fanatics referred to these price floors as "suggestions," the contracts made clear that failure to comply with these minimum prices could result in Fanatics suspending or terminating the shop's account. Fanatics' ability to enforce these terms was rooted in its impending control over the supply of trading cards for the NFL, NBA, and MLB. Local trading card shops therefore had little choice but to comply if they wanted to stay in business.

17.     In August 2023, Panini filed a lawsuit against Fanatics in the Middle District of Florida, alleging, among other things, that Fanatics monopolized the Pro Sports Trading Cards market.[1] On November 3, 2023, Panini's case was transferred to this District.[2] On March 10, 2025, the Court largely denied Fanatics' motion to dismiss Panini's complaint.[3] Critically, the Court found that Panini plausibly alleged that Fanatics monopolized and attempted to monopolize the Pro Sports Trading Cards market.[4] Additionally, the Court found that Panini plausibly alleged that Fanatics' exclusive licensing deals with the Leagues and the Players

---

[1] Mike Scarella, *Sports Card Platform Panini Sues Rival Fanatics over Antitrust Claims*, Reuters (Aug. 3, 2023), https://www.reuters.com/legal/litigation/sports-card-platform-panini-sues-rival-fanatics-over-antitrust-claims-2023-08-03/; *see also* Amended Complaint, *Panini Am., Inc. v. Fanatics, Inc.*, No. 1:23-cv-9714 (S.D.N.Y. Oct. 10, 2023), ECF No. 69.
[2] Order, *Panini Am.*, No. 1:23-cv-9714 (S.D.N.Y. Oct. 31, 2023), ECF No. 75.
[3] Memorandum Order, *Panini Am.*, No. 1:23-cv-9714 (S.D.N.Y. Mar. 10, 2025), ECF No. 164.
[4] *Id.* at 10–19.

Associations amounted to unreasonable restraints of trade under Section 1 of the Sherman Act.[5]

18.     The anticompetitive effects of this conduct will continue, and will only intensify, once Fanatics' monopolistic takeover is complete. And because of high barriers to entry and the capital-intensive nature of the business, there is little chance that Panini or any other competitor will survive—let alone be able to challenge Fanatics—after its exclusive contracts across all Major U.S. Professional Sports League Licenses expire in 10–20 years. For decades, consumers like Plaintiffs and members of the Classes will have no choice but to buy Pro Sports Trading Cards at exorbitant, supra-competitive prices from a single company: Fanatics.

19.     Defendants' anticompetitive scheme has already reduced output and competition, and thereby artificially inflated prices, in the market for Pro Sports Trading Cards. Plaintiffs and members of the proposed Classes have been injured by paying these artificially inflated prices and will continue to be injured in the future until the alleged unlawful conduct ends.

## II.     JURISDICTION AND VENUE

20.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members in the proposed Classes; and at least one member of each of the proposed Classes is a citizen of a state different from that of one Defendant.

21.     This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

---

[5] *Id.* at 19–22.

1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Sections 1–2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, as well as Sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14, 18.

22. **Supplemental Jurisdiction**. In addition to violations of the federal antitrust laws, Plaintiffs also allege violations of state laws. All claims under federal and state law are based upon a common nucleus of operative fact and the entire action, therefore, should be commenced in a single case to be tried as one judicial proceeding. This Court, therefore, has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the state law claims will avoid unnecessary duplication of actions and support the interests of judicial economy, convenience to the litigants, and fairness.

23. **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District.

24. **Venue.** Venue in this District is proper as Defendants transact business or have registered agents in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to consumers in this District. Additionally, several Defendants are headquartered in this District or have offices in this District.

25. **Interstate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming consumers throughout the United States.

### III.    PARTIES

#### A. Plaintiffs

26. Plaintiff Sean Auld is a resident of Franklin, Massachusetts. During the Class Period, Mr. Auld purchased from a non-Defendant Pro Sports Trading Cards not for resale while residing in Massachusetts, including newly issued, fully licensed MLB, NBA, and NFL

player trading cards. The prices Mr. Auld paid for Pro Sports Trading Cards were artificially inflated as a result of Fanatics' and its co-conspirators' anticompetitive conduct.

27.    Plaintiff Daneil Enriquez is a resident of San Diego, California. During the Class Period, Mr. Enriquez purchased from a non-Defendant Pro Sports Trading Cards not for resale while residing in California, including newly issued, fully licensed MLB, NBA, and NFL player trading cards. The prices Mr. Meuse paid for Pro Sports Trading Cards were artificially inflated as a result of Fanatics' and its co-conspirators' anticompetitive conduct.

28.    Plaintiff Ryan Meuse is a resident of Leyden, Massachusetts. During the Class Period, Mr. Meuse purchased from a non-Defendant Pro Sports Trading Cards not for resale while residing in Massachusetts, including newly issued, fully licensed MLB, NBA, and NFL player trading cards. The prices Mr. Meuse paid for Pro Sports Trading Cards were artificially inflated as a result of Fanatics' and its co-conspirators' anticompetitive conduct.

29.    Plaintiff Edgar Nava is a resident of Freeport, Illinois.  During the Class Period, Mr. Nava purchased from a non-Defendant Pro Sports Trading Cards not for resale while residing in Illinois, including newly issued, fully licensed MLB, NBA, and NFL player trading cards. The prices Mr. Nava paid for Pro Sports Trading Cards were artificially inflated as a result of Fanatics' and its co-conspirators' anticompetitive conduct.

**B.  Fanatics Defendants**

30.    Defendant Fanatics, Inc. is a Delaware corporation with its principal place of business in Jacksonville, FL.

31.    Defendant Fanatics, LLC, is a sole-member Delaware LLC with its principal place of business in Jacksonville, FL.

32.    Defendant Fanatics Holdings, Inc. is a Delaware corporation with its principal place of business in Jacksonville, FL.

33.    Defendant Fanatics Collectibles Intermediate Holdco, Inc., d/b/a Fanatics Trading Cards, is a subsidiary of Fanatics Holdings, Inc., and a Delaware corporation with its principal place of business in Jacksonville, FL.

34.    Defendant Fanatics SPV, LLC, is a Delaware LLC with its principal place of business in Jacksonville, FL.

35.    Defendant Fanatics, Inc., Fanatics, LLC, Fanatics Holdings, Inc., Fanatics Collectibles Intermediate Holdco, Inc., and Fanatics SPV, LLC are technically separate entities but operate as one unified company under the name "Fanatics." The allegations herein are against the Fanatics companies both individually and collectively.

### C.  Professional Sports League Defendants

36.    Defendant Major League Baseball ("MLB") is an unincorporated association of the 30 Major League Baseball teams (29 from the United States), and is based in New York, NY.

37.    Defendant Major League Baseball Properties, Inc. ("MLBP") is a New York corporation with its principal place of business in New York, NY. It is responsible for licensing the names, marks, and logos of each of the MLB's teams, including to trading card companies.

38.    Defendant Major League Baseball Players Association ("MLBPA") is the labor union representing Major League Baseball players, and is based in New York, NY.

39.    Defendant MLB Players, Inc. ("MLBPI") is a Delaware corporation with its principal place of business in New York, NY. It is a for-profit corporate subsidiary of MLBPA that is responsible for licensing the names, images, and likenesses of Major League Baseball players. MLBPI markets the collective rights of MLB Players through licensing companies, sponsoring brands that want to associate their products with Major League players and developing new initiatives. Player-licensed products include trading cards, collectibles,

electronic games, digital products, apparel, and novelties.

40.    Defendant National Football League ("NFL") is an association of the 32 National Football League teams, all from the United States, and is based in New York, NY.

41.    Defendant NFL Properties LLC ("NFLP") is a Delaware LLC based in New York, NY responsible for licensing the names, marks, and logos of each of the NFL's teams, including to trading card companies.

42.    Defendant National Football League Players Association ("NFLPA") is the labor union representing NFL players, and is based in Washington, DC.

43.    Defendant NFL Players Inc. ("NFLPI") is the marketing and licensing subsidiary of NFLPA. It is responsible for licensing the names, images, and likenesses of NFL players for products such as trading cards, collectibles, electronic games, digital products, apparel, and novelties. It is based in Washington, DC.

44.    Defendant National Basketball Association ("NBA") is an association of the 30 National Basketball Association teams (29 from the United States), and is based in New York, NY.

45.    Defendant NBA Properties, Inc. ("NBAP") is a New York corporation with its principal place of business in New York, NY. It is responsible for the licensing of the names, marks, and logos of each of the NBA's teams, including to trading card companies.

46.    Defendant National Basketball Players Association ("NBPA") is a Delaware corporation and the labor union representing National Basketball Association players. It is based in New York, NY. NBPA is responsible for licensing the names, images, and likenesses of National Basketball Association players.

47.    Defendant OneTeam Partners, LLC, is a Delaware LLC with its principal place

of business in Santa Monica, CA. OneTeam Partners was founded in 2019 as a joint venture between MLBPA and NFLPA. It markets and licenses the names, images, and likenesses of the athletes and players associations that it represents.

**D.  Non-Parties**

48.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants.

49.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

50.    Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

51.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

**IV.    RELEVANT MARKETS**

**A.  Fully Licensed Pro Sports Trading Cards**

52.    The products at issue are newly issued, fully licensed Pro Sports Trading Cards, and the business involved here concerns the design, production, marketing, and sale of these cards.  In the United States, annual sales of Pro Sports Trading Cards total several billion dollars.

53.    Consumers, like Plaintiffs and members of the Classes, prefer fully licensed Pro Sports Trading Cards—meaning those that display the League logo, League players association logo, the team uniform, the color combinations of the team, and the player's name, image, and likeness (and sometimes more).

54.    Each League today controls not only its own marks and logos, but also the

names, marks, and logos of all the League's teams. But no League controls the intellectual property in *player* names, images, signatures, and the like. Therefore, no League can produce and sell any product in-house that includes the use of player names, images, signatures, and the like—and no League has a preexisting monopoly over these products.

55.     Similarly, today, each Players Association for each League (i.e., MLBPA, NBPA, and NFLPA), through a group-licensing agreement with its own member-athletes, generally controls the group licensing of its members' intellectual property, and each of the Players Association's members agree to significantly restrict their ability to enter into individual licenses.

56.     The Leagues' Players Associations do not hold intellectual property that includes League marks, League logo, team names, team uniforms, and color combinations. Therefore, the Leagues' Players Associations cannot produce or sell any product in-house that includes the use of League logo, team names, team uniforms, and color combinations. Further, no Players Association has a pre-existing monopoly over such products.

57.     Accordingly, producing fully licensed Pro Sports Trading Cards of players in each league complete with League logo, League Players Association logo, team uniform, color combinations, and player image today at least requires a license from both the player's League and a license from the player's Players Association (each referred to here as a "Major League License"). These two ingredients are critical. No other option exists for producing and selling fully licensed Pro Sports Trading Cards, and no individual League or individual Players Association could produce and sell fully licensed trading cards on its own.

58.     Thus, unlike other holders of intellectual property, the Leagues and Players Associations cannot effectively use their intellectual property independently to produce Pro

Sports Trading Cards. For such cards to be fully licensed and meet consumer demand, there must be a combination of the right to use the player's name, image, and likeness; the right to use the name, logo, and uniform of the player's team and League; and the intellectual property and expertise of the third-party card supplier such as Panini or Fanatics.

59.     If a third-party licensee secures licenses from both a League and that League's Players Association, it can produce and sell fully licensed trading cards of players in that League. It can also seek out other licenses to further enhance its production and sale of fully licensed Pro Sports Trading Cards. One of these further licenses is a license with an individual player.

60.     The group player rights licensed by the Players Associations typically include facsimile signatures of the players—rather than original, handwritten autographs that can be provided by players on an individual basis. This means a licensee also can add features to a Pro Sports Trading Card by contracting with an individual player for the right to use that individual player's original, handwritten autograph, pieces of that player's uniforms or shoes, and that player's name, image, and likeness on an individual rather than group basis.

61.     In summary, a League can license its intellectual property of League marks, team names, color combinations and the like. A Players Association can license its intellectual property (received from its players): the right to use player names, images, signatures, and the like on a group basis along with other players. By themselves, these licenses are not enough to produce and sell a fully licensed Pro Sports Trading Card of players in that League. Thus, neither a League nor a Players Association can effectively use its intellectual property independently. Instead, both Leagues and Players Associations require a third-party licensee (like Fanatics or Panini) to produce and sell fully licensed Pro Sports Trading Cards. A third-

party licensee can execute other deals to enhance the fully licensed Pro Sports Trading Cards it

seeks to produce and sell, such as deals with individual players for original, handwritten

autographs.



**Figure 1: Example of a 2025 Fanatics-produced MLB player trading card**

**B.  The Relevant Product Markets**

62.    The relevant market here is the market for all Major U.S. Professional Sports

Leagues trading cards in the United States: a combined market including NBA player trading

cards, NFL player trading cards, and MLB player trading cards.

63.    The relevant product market is limited to newly issued, fully licensed Major

U.S. Professional Sports Leagues trading cards created by card producers and sellers like

Fanatics and Panini. In industry terms, this is the "primary" market, and it is distinct from the

resale (or "secondary") market.

64.    The size and importance of the markets for other U.S. league sports—such as

the National Hockey League ("NHL"), Major League Soccer ("MLS"), and the Women's

National Basketball Association ("WNBA")—are marginal in comparison to the "big three"

Major U.S. Professional Sports Leagues. Even if NHL, MLS, and WNBA player trading cards are included within the market for Major U.S. Professional Sports Leagues trading cards, the market definition, market-power, and competitive-effects allegations here would remain unchanged. So, too, for college sports.

65.     Major U.S. Professional Sports Leagues trading cards are distinct from and do not compete with other trading cards, including trading cards for other professional sports or collegiate sports.

66.     In the United States, the popularity, familiarity, and viewership of the Major U.S. Professional Sports significantly exceeds all other sports. And the interests, preferences, and loyalties of professional sports enthusiasts of Major U.S. Professional Sports Leagues dictate that only a Major League License will suffice to compete in the relevant markets. There is no close substitute for a Major League License in the associated professional sport to reach consumers devoted to that sport, a team in the associated League, and favorite players on that team or in that sport.

67.     Due to their popularity and long history, Pro Sports Trading Cards enjoy greater visibility and are more readily accessible for purchase by consumers, like Plaintiffs and members of the Classes, than other sports trading cards. Among sports trading cards displayed at retailers, Pro Sports Trading Cards typically receive the most shelf space and are displayed more prominently than trading cards for other sports. At some retailers, Pro Sports Trading Cards are the only sports cards available. Similarly, at online retailers, Pro Sports Trading Cards are displayed more prominently on webpages and generally come up first in search results for sports trading cards.

68.     The trading cards of other sports teams—such as those for NHL, MLS,

collegiate sports, and the WNBA—do not have significant cross-elasticity with Pro Sports Trading Cards. For the same reasons, sports trading cards for other non-team sports, such as NASCAR, PGA, WWE, and UFC, are even less reasonable substitutes for Pro Sports Trading Cards.

69.     Other types of trading cards, such as Pokémon, Yu-Gi-Oh!, or Magic cards, are even more removed from the relevant markets. These cards are distinguished from Pro Sports Trading Cards in obvious ways, including price, appearance, use, and content. Consumers do not view these other types of entertainment trading cards as interchangeable with Pro Sports Trading Cards.

70.     A small but significant non-transitory increase in the price of Pro Sports Trading Cards would not substantially raise demand for other sports trading cards or other types of trading cards.

71.     The production and sale of Pro Sports Trading Cards requires—along with the licenses from the Leagues and Players Associations described above—access to specialized manufacturing techniques and specifications and employees skilled in the successful creation, design, and marketing of Pro Sports Trading Cards. There are substantial entry barriers to the business, including significant investments associated with development and manufacturing. To overcome these barriers, a licensee (like Fanatics or Panini) must be able to produce and sell trading cards for players of at least one Major U.S. Professional Sports League. NBA player trading cards, NFL player trading cards, and MLB player trading cards are the only three types of sports trading cards with sufficient consumer demand—and thus revenues—to allow a firm to secure and maintain a competitively substantial market presence.

72.     As a result of consumer preferences and a degree of product differentiation, the

Pro Sports Trading Cards market is further divided by producers, distributors, and consumers into markets for Mass Market trading cards and for Premium trading cards.

73.     Significant differences in price, distribution channels, quality of output, and product design distinguish Mass Market from Premium cards. Mass Market cards are sold at a low price—such as $5–15 per "packet" of eight to-ten cards—through mainstream channels such as Walmart, Target, pharmacy chains, and other retailers at which sports fans (or their parents) often shop. Premium cards sell for hundreds or even thousands of dollars per packet or case at specialist retailers known as local trading card shops (or hobby shops), online retailers, and through case breaking—i.e., opening new trading card cases and packets over an internet livestream.

74.     Premium cards include such features as hand-signed autographs or pieces of jerseys integrated into the cards, or both.



**Figure 2: Example of 2022 Premium Topps MLB card**

75.     Some Mass Market packs include cards with signatures or other special features, but the frequency is far lower than for Premium cards.

76.     Mass Market cards are targeted at casual collectors, such as children and casual enthusiasts. These cards are the modern successor to the bubble-gum packets of decades past.

18

77.     Among consumers, the product interchangeability between Mass Market cards and Premium cards is limited. Large price differences, for example, distinguish the two different types of cards, and transparent quality differences make the two types of cards suitable for different collectors with very different aims.

78.     There is also limited interchangeability between either Mass Market cards or Premium cards and other sports collectibles such as jerseys, hats, and apparel. The Pro Sports Trading Cards market is distinguished from these other sports products by all the traditional indicia of market differentiation. Defendants recognize that Pro Sports Trading Cards form a distinct market because they license Pro Sports Trading Cards separately from other memorabilia. Pro Sports Trading Cards and other memorabilia are produced by different firms using different facilities. There are obvious differences in the construction, appearance, and use of Pro Sports Trading Cards (which are often traded or collected) and, for example, apparel (which may be worn). Very few consumers collect apparel related to more than one team. Retail outlets and other businesses specialize in Pro Sports Trading Cards. There are significant price differences between Pro Sports Trading Cards and other memorabilia. Put starkly, consumers do not view a baseball hat as interchangeable with a pack of baseball trading cards.

79.     There is minimal, if any, cross elasticity of demand between Pro Sports Trading Cards and other memorabilia. Indeed, Fanatics' conduct—its plan to monopolize the market for Pro Sports Trading Cards—makes sense only because Pro Sports Trading Cards are a distinct product that consumers value independently of other types of memorabilia.

80.     Investing in art and non-card collectibles such as pens or watches is even less a substitute for collecting or trading Mass Market or Premium Pro Sports Trading Cards.

81.     Within the larger market for Pro Sports Trading Cards exist smaller submarkets,

which include NBA player trading cards, NFL player trading cards, and MLB player trading cards. These submarkets are alleged in the alternative as relevant markets for purposes of Plaintiffs' claims.

82.    The NBA, NFL, and MLB consist of thirty, thirty-two, and thirty teams, respectively. In each League, each of the teams has agreed to give exclusive control over the licensing of their names, logos, and uniforms to their League for licensing the production and sale of the trading cards at issue here.

83.    For many fans of the "big three" Leagues, given the similarities in popularity, history, and consumer access to trading cards for players of these sports, there is significant cross elasticity of demand among NBA player trading cards, NFL player trading cards, and MLB player trading cards.

84.    However, many consumers do not view trading cards for players from one League as interchangeable with cards for players from another League. They prefer to collect cards from one of the Major U.S. Professional Sports Leagues over the cards from other Leagues. In fact, some consumers prefer to collect full sets of cards from one League, but not the others, while others are interested in one sport but not the other. For example, some consumers do not view MLB player trading cards as interchangeable with NFL player trading cards. Even some fans of both sports do not regard their cards for one sport as interchangeable with cards for the other sport. Each of the Major U.S. Professional Sports Leagues is well established, unique, and has its own devoted followers. For these customers, the interchangeability of cards is constrained in satisfying consumer demand.

85.    Accordingly, an entity that can monopolize and control the business for newly issued, fully licensed Pro Sports Trading Cards has a distinct ability to increase prices and

engage in other anticompetitive activity.

86.    As with the Pro Sports Trading Cards market, the submarkets for NBA player trading cards, NFL player trading cards, and MLB player trading cards are further divided by producers, distributors, and consumers into markets for Mass Market trading cards and for Premium trading cards for the reasons discussed above.

87.    In summary, the products at issue here—newly issued, fully licensed Pro Sports Trading Cards—implicate two relevant markets: Mass Market and Premium cards for Major U.S. Professional Sports Leagues trading cards. In the alternative, Pro Sports Trading Cards implicate six relevant submarkets: Mass Market and Premium cards for each of (1) MLB player trading cards; (2) NBA player trading cards; and (3) NFL player trading cards. Collectively, these eight markets are referred to as the "Relevant Markets."

88.    In addition, for distributors and producers of cards, there is no substitutability for critical supply side inputs. All the inputs described herein are necessary to produce and sell trading cards in these markets, including (a) licenses from sports leagues that control the use of team colors, logos, and names; (b) licenses from players associations for the use of player names, images, and likenesses; (c) contracts with individual players to provide original autographs and clothing to embed in certain cards along with their name, image, and likeness; (d) specialized manufacturing for production of the cards; and (e) employees skilled in the successful creation, design, and marketing of Pro Sports Trading Cards.

89.    Each Relevant Market also may contain further submarkets with competitive significance for the actions here.

90.    In addition to the barriers to entry resulting from Fanatics' anticompetitive conduct, the Relevant Markets have barriers to entry, including (because of the need for

licenses) the limits on individual teams granting their own licenses, limits on individual players granting their own licenses, the existence of exclusive licenses, specialized high-tech manufacturing requirements, and the need for skilled workers such as card designers, program designers, product developers, athlete-acquisition managers, and specialist-print managers.

91.     Where licenses are exclusive, a new prospective entrant typically would need to wait for, within a given League, both the League and players association contracts to be approaching termination, then bid for the exclusive or nonexclusive license from that League and players association. By having the ability to produce and sell trading cards for players of at least one Major U.S. Professional Sports League, a firm could maintain a market presence that allowed it to compete in the future for the production and sale of trading cards for players of other Leagues. But any firm that fails to win the rights to produce and sell trading cards for players of at least one of the Leagues is eliminated as a competitor.

92.     These barriers inhibit new entry from firms outside the markets for Major U.S. Professional Sports Leagues trading cards.

**C.  Relevant Geographic Market**

93.     The appropriate geographic market is the United States. Pro Sports Trading Cards are sold and distributed to customers throughout the United States, through both online stores and brick-and-mortar retail stores.

94.     Consumers generally purchase Pro Sports Trading Cards within their own country. Moreover, the interest in sports is generally country-specific, with the U.S. market focused on the Major U.S. Professional Sports Leagues, while foreign markets may favor other sports, such as cricket, rugby, or soccer. Thus, as to the market for Pro Sports Trading Cards and the individual League submarkets, the relevant geographic area is the United States.

95.     Consumer preferences and demand for trading cards of particular leagues also

22

vary by country. In the United States, cards for NFL players, NBA players, and MLB players constitute the vast majority of Pro Sports Trading Cards sales.

## V.    ANTICOMPETITIVE CONDUCT IN THE RELEVANT MARKETS

96.    Before Defendants' anticompetitive conduct, there was competition in and for the Relevant Markets, and third-party card suppliers obtained licenses through public bidding. Even where a supplier obtained an exclusive license—such as Panini's exclusive licenses with the NBA—these were obtained through public bidding. Further, no exclusive contract has lasted more than ten years.

97.    This historical competitive landscape in the Pro Sports Trading Cards industry has been completely altered by Defendants' anticompetitive conduct.

### A.  Fanatics Gains a Long-Term Monopoly by Securing Exclusive Deals with all Major U.S. Professional Sports Leagues

98.    In August 2021, Fanatics simultaneously announced the acquisition of five leading professional sports licenses in North America: MLB, the MLBPA, the NBA, the NBPA, and the NFLPA. Shortly after, Fanatics also acquired the NFL exclusive license, thus exclusively securing all six of the Major League Licenses for Major U.S. Professional Sports Leagues trading cards with terms beginning in 2025 and 2026. Accordingly, by 2026 Fanatics will control 100% of the Relevant Markets for a term of at least ten years.

99.    On January 4, 2022, in the wake of signing its exclusive deals that neutered Topps' ability to make MLB player trading cards beyond 2025, Fanatics announced that it had acquired Topps, the longest-tenured producer of Pro Sports Trading Cards and—due to Topps' exclusive license with the MLB—the sole producer of newly issued, fully licensed MLB player trading cards. By acquiring Topps and its licenses, Fanatics gained an immediate exclusive license with the MLB that lasts through 2025, allowing Fanatics to monopolize the MLB

submarket and begin to monopolize the Relevant Market. Fanatics was able to purchase Topps for a bargain of $500 million—significantly less than Topps' $1.3 billion valuation prior to Topps losing the MLB and MLBPA licenses.[6]

100.    Fanatics' exclusive deals with the Major U.S. Professionals Sports Leagues and their players associations were of unprecedented length and scope. The extreme duration and combination of these key inputs is something the Pro Sports Trading Cards industry has never seen before.

101.    Four of the licenses (the licenses that Fanatics acquired from the NFL, NFLPA, MLB, and MLBPA) are for twenty years. Fanatics' licenses with the NBA and NBPA, the exact terms of which have not been made public, are for at least ten years.

102.    The durations of Fanatics' exclusive dealing arrangements are beyond anything that is necessary for any legitimate economic or other purpose. Twenty years, by a wide margin, is an unprecedented exclusive-dealing duration in the Pro Sports Trading Cards business. There have never been exclusive deals close to that duration in the Pro Sports Trading Cards industry.

103.    For the first time ever, a single firm will hold all six Major U.S. Professional Sports League Licenses for the Major U.S. Professional Sports Leagues. By combining long-term exclusive licenses of unprecedented duration covering every Major U.S. Professional Sports League and their players associations, Fanatics positioned itself to drive actual or potential competitors out of the market and erected barriers to entry blocking their return.

104.    Fanatics' exclusive agreements foreclose competition entirely in the markets

---

[6] Jabari Young, *Fanatics Acquires Topps Trading Cards for $500 Million*, CNBC (Jan. 3, 2022), https://www.cnbc.com/2022/01/04/fanatics-acquires-topps-trading-cards.html.

for MLB player trading cards, NBA player trading cards, and NFL player trading cards. Fanatics' exclusive agreements thereby foreclose one hundred percent of the market for Major U.S. Professional Sports Leagues trading cards. Thus, Fanatics sought and is now poised to eliminate others from competing in the production and sale of Pro Sports Trading Cards by completely blocking an essential input for a long time—without a single opportunity to compete for a decade or more—and not by competition on the merits.

105.    The unprecedented duration and scope of Fanatics' exclusive dealing agreements causes substantial harm to consumers like Plaintiffs and members of the Classes. The agreements also substantially harm competition in the market for Pro Sports Trading Cards in part because competition cannot occur until the end of the exclusive contract approaches. Only at that point can there be competition "for the market"; that is, competition to replace the prior holder of the exclusive contract.

106.    Before Fanatics' anticompetitive conduct, competition for Major U.S. Professional Sports League Licenses occurred on a more frequent basis, because the agreements between the Leagues and Players Associations and the companies that produce and sell Pro Sports Trading Cards—to the extent they were even exclusive—had shorter terms and staggered expiration dates. Now, because of the unprecedented length and combination of Fanatics' exclusive-dealing arrangements, any competition "for the market" cannot take place for decades, placing consumers at the mercy of only one producer.

107.    To induce the Leagues and Players Associations to sign exclusive deals, Fanatics gave them equity ownership interest in Fanatics. In providing equity ownership interest, Fanatics used the monopoly profits it expected to earn in order to carry out its monopolization plans with the Leagues and Players Associations. The collective equity stake

of the Leagues and Players Associations is worth billions of dollars.[7]

108.    Additionally, Defendant OneTeam played a critical role in the execution of the exclusive deals with the MLBPA and NFLPA. The MLBPA and NFLPA created OneTeam as a joint venture which "specializes in the collective licensing rights of athletes."[8] In other words, OneTeam is a joint venture that combines the intellectual property of the MLBPA and NFLPA— which the individual Players Associations had themselves acquired by combining the intellectual property of their respective members—and others. It then serves as a seller of that combined intellectual property.

109.    When Fanatics announced its exclusive trading card deals with the MLBPA and NFLPA, the Executive Directors of the MLBPA—Tony Clark—and the NFLPA—DeMaurice Smith—said that the deal "never would have happened" if their organizations had not "joined forces to create OneTeam."[9]

110.    Fanatics' exclusive deals gave it long-term monopolies of unprecedented length and combination in the Pro Sports Trading Cards industry. Once announced in August 2021, the entire industry knew that Fanatics would, for many years, have complete control of the marketplace for MLB, NFL, and NBA player trading cards along with the broader market for player trading cards for the Major U.S. Professional Sports Leagues. That reality, assured by a web of anticompetitive contracts, gave Fanatics unprecedented power to secure monopolies for

---

[7] Jabari Young, *Fanatics Wants to Be a $100 Billion Company – Here's How It Plans to Get There*, CNBC (Apr. 11, 2022, 4:55 PM), https://www.cnbc.com/2022/04/11/fanatics-aims-to-be-100-billion-company.html.
[8] *OneTeam Partners: License to Thrill*, Retail Merchandiser Mag. (Dec. 20, 2021), https://retail-merchandiser.com/news/oneteam-partners/.
[9] Jared Diamond and Andrew Beaton, *The Player-Led Venture that Turned Trading Cards Upside Down*, Wall Street J. (Oct. 6, 2021), https://www.wsj.com/sports/football/trading-cards-nfl-mlb-nba-one-team-11633520569.

itself in the near term, too.

**B. Fanatics Leverages Its Long-Term Monopoly Gained by Exclusive Deals in the Future to Obtain a Monopoly Throughout the Class Period**

111.    Securing its exclusive deals of extreme length and in an extreme combination was critical to Fanatics' overall plan. In the first instance, these deals gave Fanatics monopolies of the Relevant Markets for the long term. But then Fanatics leveraged those long-term monopolies to monopolize those same markets throughout the class period through coercive, unfair, and anticompetitive conduct.

112.    As intended by Fanatics, these exclusive deals effectively facilitated Fanatics' subsequent anticompetitive attacks on Panini and other market participants and ensured that Fanatics could maintain the monopolistic fruits of its anticompetitive conduct for decades— and even beyond that, given the barriers to entry that Fanatics has erected and is erecting. Other market participants such as Leaf have already been driven out of the market for fully licensed Pro Sports Trading Cards, forced to focus instead on smaller, more niche sports due to these exclusive deals.[10]

113.    Fanatics then undertook numerous actions, which were facilitated by Fanatics' long-term exclusive deals—with the purpose and dangerous probability of success of monopolizing those same markets throughout the class period—with the purpose and effect of reinforcing its long-term monopolies. These actions included acquisitions and exclusionary deals with Panini's employees, suppliers, star professional basketball and football players, and other industry participants.

---

[10] Will Stern, *Leaf to Produce Set for Minor-League Players*, Yahoo Sports (June 30, 2025), https://sports.yahoo.com/article/leaf-produce-set-minor-league-200000445.html.

### 1. *Fanatics Bought Topps*

114.    After announcing its exclusive deals in August 2021, on January 4, 2022, Fanatics announced that it bought Topps for a price reported to be in the range of $500 million. At the time, Topps—the longest-tenured Pro Sports Trading Cards company—was producing MLB player trading cards with an exclusive license with the MLB that ran until 2025 and a semi- exclusive license with the MLBPA that ran until the end of 2022. Topps also had an exclusive license with MLS.

115.    Fanatics' acquisition of Topps solidified and increased Fanatics' market power, which in turn it leveraged as described herein to disadvantage competitors.

### 2. *Fanatics Acquired Control over GCP*

116.    Just two months later, in March 2022, Fanatics acquired a controlling stake over GC Packaging, LLC ("GCP"), a highly specialized manufacturer responsible for producing over ninety percent of Panini's Pro Sports Trading Cards.

117.    Fanatics' acquisition of control over GCP gave Fanatics control over an essential input—the production of nearly all Pro Sports Trading Cards—of its sole competitor in the Relevant Markets, Panini. For example, when Panini recently wished to discuss business with GCP, it was informed that GCP would need to obtain direction and feedback from Fanatics first.

118.    Fanatics' control over Panini's production was the purpose of its acquiring control of GCP. After acquiring this control, Fanatics' CEO, Michael Rubin, told Panini's CEO, Mark Warsop, that Fanatics could now turn off the GCP machines devoted to Panini whenever it wanted, and Fanatics has done just that.

119.    In November 2021, before Fanatics acquired control of GCP, GCP told Panini that it would have capacity to produce 297 million packs in 2022 and 336 million packs in

2023 for Panini. But when Fanatics acquired control over GCP, everything changed.

120.     In 2022, Rubin's threat to turn off the GCP machines became reality: GCP delivered only 58% of Panini's requested production. In 2023, GCP delivered around 61% percent of Panini's requested production. GCP continues to delay Panini's product releases with little to no notice, undermining a key competitor's ability to produce Pro Sports Trading Cards.

121.     Ultimately, in 2022, GCP's reduced manufacturing caused an output shortfall of over 100 million packs of Panini Pro Sports Trading Cards and delayed programs (or releases) into 2023, resulting in canceled orders and lost or reduced sales. Panini had no alternative source of manufacturing supply during this time. Consumers who could not buy Panini cards were forced to buy Topps cards.

### 3.   *Fanatics Raided Panini for Employees*

122.     Employees skilled in the successful creation, design, and marketing of Pro Sports Trading Cards are another key input for competing in the Relevant Markets. Fanatics secured control of this key input, too.

123.     After gaining control over Topps' employees in the acquisition, Fanatics launched a raid of Panini for such a key input: its employees. As of October 2023, 36 employees left Panini to join Fanatics, lured by a combination of threats and improper inducements.

124.     For example, Fanatics used the monopoly power and effective market control from its present and future exclusive deals to induce some employees to come to Fanatics by threatening them with not working in the industry ever again once Panini's licenses expired unless those employees committed immediately to join Fanatics. That Fanatics, in a few years, would hold long-term exclusive licenses to all Major U.S. Professional Sports Leagues (and

their Players Associations) provided credibility to these threats.

125.    At times, Fanatics went even further, telling Panini's employees that Fanatics would soon take over Panini's business before Panini's licenses expired and thus Panini—and with it these employees' jobs—would no longer exist. So, if these employees wished to continue in the industry, Fanatics' story went, they needed to join Fanatics immediately. Fanatics hired these employees even though they were surplus to its requirements prior to commencement of Fanatics' additional exclusive licenses in 2025, demonstrating that its motivation was to control this critical input instead of to produce baseball cards.

126.    This employee raid interfered with Panini's business operations and its ability to produce enough Pro Sports Trading Cards to meet demand. This, in turn, harmed consumers like Plaintiffs and members of the Classes, who previously had benefited from market competition.

### 4.  *Fanatics Paid Star, Rookie Players Not to Deal with Panini*

127.    Another key input to competing in the Relevant Markets is contracts with individual players for the right to use their original, handwritten autograph on their trading card.

128.    In April 2023, in order to further remove its only competitor in the Relevant Markets, Fanatics began a targeted effort to sign exclusive deals with star, rookie players—even in the NFL and NBA, where Fanatics lacked licensing rights until 2025. These deals prevented the license holder, Panini, from including those players' original, handwritten autographs with its trading cards during the remaining years of Panini's existing licenses. In essence, Fanatics offered these players large sums to keep their original, handwritten autographs off the most important Pro Sports Trading Cards for the critical, early years of their careers during which they otherwise are trying to enhance their reputation and when their cards

generally are most desired by consumers. Accordingly, newly issued, fully licensed, autographed trading cards have *not been produced by anyone* for several star NFL and NBA players since 2023.

129.    As with Panini's employees, Fanatics also used threats to persuade these athletes to sign with Fanatics rather than Panini. For example, Fanatics also threatened players that if they did not immediately sign with Fanatics, they would never get an autograph deal in the future when Fanatics' long-term, exclusive deals began.

130.    Panini holds exclusive licenses with the NBA and NFL until October 2025 and April 2026, respectively, to use those Leagues' marks, such as team uniforms, logos, and color combinations.[11] Therefore, Fanatics cannot sell these players' original, handwritten autographs on fully licensed until October 2025 and April 2026, respectively. The most it can do is create what the Pro Sports Trading Cards industry pejoratively call "pajama cards" that brush out all League marks, generally resulting in low-quality cards depicting players seemingly in pajamas. Consumers do not desire these types of cards nearly as much as fully licensed cards.

---

[11] Larry Holder, *Caitlin Clark Leads WNBA Trading Cars and Collectibles Boom that's Continuing to Grow*, Yahoo Sports (May 15, 2025), https://sports.yahoo.com/article/caitlin-clark-leads-wnba-trading-171605059.html; Dan Hajducky, *Panini America Alleges Fanatics Has Created Monopoly in Card Industry*, ESPN (Aug. 3, 2023), https://www.espn.com/espn/story/_/id/38129682/panini-america-alleges-fanatics-created-monopoly-card-industry.



**Figure 3: Example of Topps football "pajama" card, with no NFL or team logos**

131.     By signing these players to exclusive deals over the remaining terms of Panini's licenses with the NBA and NFL, Fanatics deprived consumers of the opportunity to buy trading cards with original, handwritten autographs. Fully licensed rookie cards—especially those with original autographs—are especially sought out by consumers, but because of Fanatics' conduct, these rookie cards have not been produced for several players since 2023.

### 5.   *Fanatics Coerced Distributors and Big-Box Retailers*

132.     Fanatics' anticompetitive conduct includes Fanatics' use of its monopoly power and effective market control to threaten distributors, who supply Pro Sports Trading Cards to big- box retail stores, with cutting them off if they do not provide Fanatics with higher margins, likely pressuring them to compromise quality of service, to the detriment of consumers like Plaintiffs and members of the Classes.

133.     Fanatics has renegotiated terms directly with many big-box retailers that require the retailers to carry a more limited line of Pro Sports Trading Cards options—the ones belonging only to Fanatics (through Topps), further compromising consumer choice.

134.     In doing so, Fanatics intentionally signaled to both the distributors to the big-box retailers and the big-box retailers themselves that, because of its total control over player

trading cards for the Major U.S. Professional Sports Leagues, Fanatics will soon be the only way for them to receive necessary trading card products.

135.    Following through on its threat, Fanatics eliminated from its roster of United States distributors the largest distributor of Pro Sports Trading Cards, GTS Distribution.

136.    Fanatics' actions relating to GTS, the other distributors to big-box retailers, and the big-box retailers themselves harm consumers like Plaintiffs and members of the Classes by, among other things, reducing consumer choice, reducing competition, and ultimately raising prices.

### 6.   *Fanatics Coerced Local Trading Card Shops*

137.    After obtaining its exclusive deals and after acquiring Topps, Fanatics used the monopoly power and effective market control from those deals to impose terms on local trading card shops that are anticompetitive and harm competition and consumers like Plaintiffs and members of the Classes.

138.    Fanatics sent contracts to local trading card shops requiring them to acknowledge that whenever Fanatics wished, it could unilaterally issue minimum prices available to consumers to pay for Fanatics trading cards. Although Fanatics labeled these unilaterally controlled, minimum price requirements as "suggestions," Fanatics made clear that if local trading card shops ignored these price floors, that would be grounds for Fanatics suspending their accounts.

139.    Because Fanatics will soon control the entire market for Pro Sports Trading Cards—and with that control the ability to decide which local card shops (if any) receive MLB, NFL, and NBA player trading cards—local trading card shops must comply with minimum-price requirements as decreed by Fanatics.

140.    This ultimately results in higher prices for consumers like Plaintiffs and

members of the Classes, with lower output.

141.    Fanatics also reduced consumer choice by pressuring local trading card shops not to sell Pro Sports Trading Cards on business-to-business trading card websites by threatening to never again supply those shops with Pro Sports Trading Cards if they do so.



**Figure 4: Report of new terms imposed on local trading card shops[12]**

142.    Fanatics' coercive terms imposed on big-box retailers and local trading card shops have limited competition, raised prices, and entrenched Fanatics' monopoly—all without any procompetitive justification.

### 7.   *Other Anticompetitive Actions*

143.    *Fanatics Coerced Case Breakers*. Fanatics also has coerced a key participant in the Pro Sports Trading Cards industry: "case breakers." Case breakers help bring new Pro

---

[12] Shaiel Ben-Ephraim, *Fanatics Places New Limitations on Hobby Shops*, Cardlines (June 22, 2023), https://cardlines.com/fanatics-place-new-limitations-on-hobby-shops/.

Sports Trading Cards product to market, "breaking"—or opening—new trading card cases and packets by livestreaming over the internet. Case breakers, by necessity, need cases of product to break. Fanatics has made clear to them that their ability to secure those cases will be thwarted unless they immediately migrate to Fanatics' new case-breaking platform, Fanatics Live, on terms so draconian as to run their case-breaking business into the ground. This serves two purposes for Fanatics that comport with its anticompetitive plan. For one, it forces case breakers who would rather operate on other case-breaking platforms to migrate to Fanatics Live. For another, once those case breakers have migrated, it slowly forces them out of business so that only Fanatics' case breakers, or Fanatics' preferred case breakers, will remain—all of whom will operate only on Fanatics' platform. This will result at a minimum in reduced consumer choice and reduced output of case-breaking services. Reduced output means higher prices. This coercion to Fanatics Live is also without any procompetitive justification.

144.    *Fanatics Disparaged Panini to Third Parties*. In or around April 2023, Fanatics began disseminating false and derogatory statements about Panini to three sets of third parties that are central to Panini's operations under its existing licenses: (1) players, player agents, and player representatives; (2) players associations; and (3) Panini's current and now-former employees. In order to exclude Panini as a competitor in the Relevant Markets, Fanatics informed these third parties that Panini is incapable of performing for them, will be out of business soon, and lacks the money to pay them. According to Panini, these statements of asserted facts are false.

145.    *Fanatics Cut Off Panini's Supply of Jerseys*. Pro Sports Trading Cards that include a piece of a player's jersey are especially valuable to collectors and hobbyists. Critical to that offering is obtaining the jerseys themselves. For years, Panini obtained most of its

supply of official player jerseys from Fanatics, which has a monopoly over jersey sales in Major U.S. Professional Sports Leagues. While Panini received and paid for orders submitted before May 2023, in May 2023, Fanatics cut off Panini's ability to place new orders to buy jerseys.

146.   *Fanatics Induced NFLPA to Attempt to Terminate its License Agreement with Panini*. Fanatics' exclusive deal with the NFLPA provides that if the NFLPA were to terminate its deal with Panini early, the deal with Fanatics would become immediately effective. Fanatics induced the NFLPA to find a way to claim it could terminate its agreement with Panini before its term expired. In August 2023, NFLPA terminated its agreement with Panini. Fanatics' goal was that the NFL would terminate its agreement with Panini early, too, thus allowing Fanatics to produce fully licensed NFL player trading cards for those seasons.

147.   Following arbitration, a panel unanimously found that the NFLPA had breached its agreement with Panini and awarded Panini over $7 million in damages.

148.   At the time the NFLPA signed its 20-year exclusive deal with Fanatics, the NFLPA was led by president JC Tretter and executive director Lloyd Howell. Both leaders resigned in July 2025, following reports that NFLPA leadership betrayed the interests of their players in order to line their own pockets.[13]

149.   *Fanatics Induced WWE to Attempt to Terminate its Contract*. Within days of the NFLPA's attempt to terminate its contract with Panini and announcing Fanatics was its

---

[13] *See* Ayrton Ostly, *JC Tretter Resigning from NFLPA amid Scandals within Union*, USA Today (July 21, 2025), https://www.usatoday.com/story/sports/nfl/2025/07/20/jc-tretter- resigning-nflpa-nfl-lloyd-howell/85301498007/; Mike Florio, *NFL, NFLPA Concealed Another Grievance Ruling*, NBC: Pro Football Talk (July 17, 2025), https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/nfl-nflpa-concealed-another-grievance-ruling.

new exclusive partner, World Wrestling Entertainment, LLC ("WWE") did the same. It attempted to terminate its contract with Panini's parent company, Panini S.p.A., and it has been reported that WWE has also now partnered exclusively with Fanatics—purportedly effective immediately. Although WWE is not part of the Relevant Markets, Fanatics inducing WWE to try to terminate its exclusive deal with Panini S.p.A. is evidence of Fanatics' overall intent and reflects Fanatics seeking to leverage its market and monopoly power in the Relevant Markets to harm competition in another market.

## VI.    FANATICS' MARKET POWER

150.    Fanatics' anticompetitive conduct has completely altered the competitive landscape of the Relevant Markets.

151.    Through its anticompetitive conduct, Fanatics has specifically intended to and has monopolized the overall market for Pro Sports Trading Cards (both Mass Market and Premium), which includes the production and sale of Pro Sports Trading Cards, and the individual submarkets for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium).

152.    It has done so for the long term and during the class period. This has erected insurmountable barriers to new entry.

153.    Fanatics has monopolized the Relevant Markets in the long term through its unprecedently long exclusive agreements with the Leagues and Players Associations, which forecloses competitors' access to the critical inputs for each of the six MLB player trading card, NBA player trading card, and NFL player trading cards submarkets (both Mass Market and Premium) for an extensively long period.

154.    Fanatics' unprecedently long agreements with respect to each League accomplish an extreme combination of those long agreements by consolidating the Pro Sports

Trading Cards market into the hands of a single firm for the first time ever, thereby covering the entire Pro Sports Trading Cards market (both Mass Market and Premium).

155.    The Pro Sports Trading Cards market will be completely controlled by a single firm for decades, one whose dominance does not result from superior products, business acumen, or even historic accident. Put differently, Fanatics has foreclosed—for decades—all competition for player trading cards for the ninety-two teams that comprise the NBA, NFL, and MLB.

156.    No firm has ever done this before, even for a few years. Fanatics, however, has created new monopolies spanning all the Major U.S. Professional Sports Leagues and their Players Associations that no other entity in the Pro Sports Trading Cards industry has ever held. Never has a single firm combined the licenses required to produce fully licensed trading cards of players for all Major U.S. Professional Sports Leagues. Fanatics' conduct has erected a barrier to entry for decades. As a result, Fanatics can raise prices in the Pro Sports Trading Cards market to supra- competitive levels, and it can compromise choice or quality without constraint by competitors.

157.    Card collectors are already seeing price increases. For instance, in 2024, a collector posted online "Topps Chrome value boxes have appeared on [F]anatics, coming in at $39.99. What happened to the days of $25/$30? Last year, $35 was a stretch, and it just doesn't stop."[14] A Pro Sports Trading Cards podcast, Spitballin' Cards, released an episode in late 2024 where they discussed the price of Pro Sports Trading Cards. They noted that prices

---

[14] u/Optimal-Scallion837, *Fanatics Needs to Calm Down with the Price Increases*, Reddit (June 20, 2024),
*https://www.reddit.com/r/baseballcards/comments/1dkgth9/fanatics_needs_to_calm_down_with_t
he_price/.*

today are at an all-time high. Regarding Fanatics-owned Topps, the host mentioned that "Topps

. . . prices are more expensive now than they've ever been."[15]

158.    The Relevant Markets are characterized by barriers to entry as discussed above.

It requires considerable brand investment, financial wherewithal, and expertise to enter the

market for Pro Sports Trading Cards or any of the other Relevant Markets. Only the Major

U.S. Professional Sports Leagues offer the volume, financial stability, and industry focus

necessary to enable a firm engaged in the production and sale of such trading cards to be a

significant competitor.

159.    If not enjoined, Fanatics' anticompetitive conduct will confer upon Fanatics a

complete, total, and long-lasting monopoly of the market for Pro Sports Trading Cards (both

Mass Market and Premium) and the individual submarkets for MLB player trading cards, NBA

player trading cards, and NFL player trading cards (both Mass Market and Premium). That

long-term monopolistic outcome is not just probable absent an antitrust remedy—it is assured

by contract.

## VII.    ANTITRUST INJURY

### A.  Higher Prices and Reduced Consumer Choice

160.    As a direct and proximate result of Defendants' anticompetitive conduct,

Plaintiffs and members of the Classes have suffered, and continue to suffer, significant antitrust

injury in the form of artificially inflated prices, reduced output, diminished product quality,

and restricted consumer choice in the market for Pro Sports Trading Cards.

161.    The exclusive, long-term agreements between Fanatics and all Major U.S.

---

[15] Spitballin' Cards, *Sports Card Boxes Are Way Too Expensive*, YouTube (Nov. 26, 2024),
https://www.youtube.com/watch?v=hQEnNb4JLvw.

Professional Sports Leagues and their players associations have foreclosed all avenues for rivals to compete for the production and sale of fully licensed trading cards. This foreclosure has not only eliminated competition for the duration of these contracts—spanning for at least a decade and, in most cases, two decades—but has also erected insurmountable barriers to entry that will persist for years, if not decades, after the contracts expire. As a result, Plaintiffs and the Classes are forced to purchase Pro Sports Trading Cards from a single, dominant supplier, with no viable alternatives.

162.    Fanatics' anticompetitive conduct has already manifested in higher prices for trading cards.  Fanatics, leveraging its market power, has raised the prices of Topps-branded cards to unprecedented levels, as evidenced by consumer complaints and industry commentary. For example, collectors have reported that the price of Topps Chrome value boxes has increased from $25–$30 in prior years to $39.99 in 2024, with no corresponding increase in quality or value.  Moreover, despite skyrocketing prices, the number of cards included in certain products has actually declined.  As one collector posted online, "Just received my 2024 Topps Series 1 hobby boxes, and was disappointed to see they not only reduced the # of packs from 24 to 20, but also cut the number of cards in each pack from 14 to 12. Net result is 28% fewer cards for an increasingly higher price."[16] This price inflation is a direct consequence of Fanatics' ability to unilaterally set prices in the absence of competitive constraints.

163.    In addition to higher prices, Plaintiffs and the Classes have experienced a reduction in output and availability of trading cards.  Fanatics' acquisition and subsequent

---

[16]*Topps Continues to Deliver Less Value with Each Passing Year*, https://www.reddit.com/r/baseballcards/comments/1as70oi/topps_continues_to_deliver_less_value_with_each/.

control over GC Packaging, the primary manufacturer for its chief competitor Panini, resulted in significant supply disruptions and delayed product releases for Panini's trading cards. In 2022 alone, Panini suffered an output shortfall of over 100 million packs, leading to canceled orders and lost sales. These supply constraints forced consumers to purchase Fanatics' products, further entrenching its monopoly power.

164.   Product quality has also declined as a result of Fanatics' anticompetitive conduct.  With the elimination of competitive pressure, Fanatics has had little incentive to maintain or improve the quality of its trading cards. Consumers have reported widespread quality-control issues with Fanatics-owned Topps products, mirroring the decline in quality observed in other Fanatics-controlled sports memorabilia markets. Collectors have also noted that the content and design of the product has declined significantly since Fanatics' takeover of Topps as well, with Premium releases including less sought after cards and substantially reduced value. The lack of competition has removed the incentive for innovation and quality improvement, to the detriment of Plaintiffs and the Classes.

165.   The consumer experience has been further harmed by a reduction in choice and variety. Fanatics has leveraged its market dominance to coerce big-box retailers and local trading card shops into carrying a more limited range of products, often to the exclusion of non-Fanatics cards. Distributors and retailers who resisted Fanatics' demands for higher margins or exclusive arrangements faced threats of being cut off from supply.  As a result, Plaintiffs and the Classes have been deprived of the ability to choose among competing products, brands, and distribution channels.

166.   Fanatics' exclusionary tactics have also targeted key industry participants such as case breakers and individual athletes. By coercing case breakers to migrate to its proprietary

platform, Fanatics Live, and by signing exclusive autograph deals with star rookie players—sometimes before it even held the relevant league licenses—Fanatics has further limited the availability and desirability of competing products. These actions have deprived Plaintiffs and the Classes of access to highly sought-after autographed rookie cards and diverse case-breaking experiences.

167.    Fanatics' anticompetitive scheme has also resulted in the loss of critical industry expertise and innovation.  Fanatics' aggressive poaching of Panini employees, under threat of industry blacklisting, has undermined Panini's ability to compete and innovate. The resulting concentration of talent within Fanatics has further entrenched its monopoly, reducing the likelihood that Plaintiffs and the Classes will benefit from new product features, creative designs, or improved consumer experiences.

168.    The cumulative effect of these anticompetitive actions is a market characterized by supra-competitive prices, reduced output, diminished quality, and restricted choice—classic hallmarks of antitrust injury.

169.    Plaintiffs and the Classes have paid, and will continue to pay, higher prices for trading cards than they would have in a competitive market, while receiving fewer and lower-quality options. These injuries are precisely the type the antitrust laws are designed to prevent and redress.

170.    Unless enjoined, Fanatics' conduct will continue to inflict ongoing and irreparable harm on Plaintiffs and the Classes. The barriers to entry created by Fanatics' exclusive agreements and exclusionary practices ensure that no meaningful competition will emerge for the foreseeable future.  Plaintiffs and the Classes are thus threatened with continued overcharges, reduced output, inferior product quality, and a lack of meaningful choice in the

market for Pro Sports Trading Cards.

**B. The Overcharges Resulting from Fanatics' Anticompetitive Conduct Were Passed Through to Consumers**

171.    When a firm's costs increase due to an overcharge or increasing material or input costs, the firm will tend to pass on the cost increase by raising its price. Otherwise, it would lose money on each sale and be driven out of business. Conversely, when a firm's costs decrease, such as from improved production efficiency or decreasing energy costs, the firm will tend to pass on the cost decrease by lowering its price. Otherwise, competitors would be able to undercut its prices, taking market share.

172.    Economic theory predicts that cost pass-through occurs in the distribution chain at issue here.  The economic necessity of passing through cost changes increases with the degree of competition a firm faces. Economic theory shows that pass-through is likely to be close to 100% in markets that are highly competitive. In a highly competitive market, all businesses will set their prices slightly above their costs, resulting in narrow profit margins. If they did not, they would go out of business in the long run either by setting prices too low and losing money on every sale, or, setting prices too high and losing business to competitors.

173.    Here, Fanatics' anticompetitive conduct has resulted in higher prices at the retail level.  The structure of the trading card distribution chain – where Fanatics, as the exclusive licensee and manufacturer, either (a) sells to distributors, who in turn supply retailers, or (b) sells directly to retailers, which then sell to end consumers – means that any increase in the wholesale prices or imposition of minimum retail prices is directly passed down the chain to consumers.

174.    Fanatics' control over both the supply and pricing of trading cards enables it to set higher prices to distributors and retailers.  For example, after acquiring exclusive licenses

43

and consolidating its market position, Fanatics renegotiated terms with distributors and big-box retailers, demanding higher margins and restricting the range of products available. Distributors and retailers, facing the threat of being cut off from supply if they did not comply, had little choice but to accept these higher prices and pass them on to their customers. Local trading card shops, in particular, were forced to adhere to Fanatics' minimum price requirements, with contracts explicitly stating that failure to comply could result in suspension or termination of their accounts.

175.    Because the distributors, retailers, and local shops operate on thin margins and are dependent on Fanatics for access to the most sought-after products, they either are unable to absorb the increased costs, or are forced, through Fanatics' pricing policies, to maintain higher prices. As a result, the overcharges imposed by Fanatics are passed through in the form of higher retail prices for consumers.

**C. The Amount of Fanatics' Overcharge Passed Through to Consumers May be Measured and Quantified**

176.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge paid by Plaintiffs and members of the Classes. Thus, the economic harm to Plaintiffs and the Classes can be quantified.

177.    Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis—called regression analysis—is commonly used in the business world, academia, and in litigation to determine the impact of a price increase on a product (or service). Thus, it is possible to isolate the effects of the anticompetitive conduct on the price of Pro Sports Trading Cards products.

44

By controlling for major market factors that affect Pro Sports Trading Cards product prices, a regression model can demonstrate whether the alleged conduct caused Pro Sports Trading Cards prices to rise above competitive levels (the "overcharge"). Similarly, the pass-through rate of the overcharge can be estimated by regressing the price of the product on the cost of the product at each level of the distribution chain, while accounting for other factors that can impact price, such as product characteristics.

## VIII.   CLASS ALLEGATIONS

178.    Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure ("Rule") 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons or entities in the United States, who, during the period beginning January 1, 2022 until such time as the anticompetitive conduct alleged herein ceases (the "Class Period"), purchased from a non-Defendant not for resale, newly issued, fully licensed Major U.S. Professional Sports Leagues trading cards produced by Fanatics.

179.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class (the "Damages Class")

> All persons or entities in the United States that purchased from a non-Defendant not for resale, in one of the *Illinois Brick* Repealer States (defined below) during the Class Period, newly issued, fully licensed Major U.S. Professional Sports Leagues trading cards produced by Fanatics.

180.    The "*Illinois Brick* Repealer States," for purposes of this Complaint, include Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaiʻi, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,

Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

181.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are: Defendants and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; Plaintiffs' counsel; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

182.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

183.    **Numerosity.** Both Classes are so numerous that joinder would be impracticable. There are likely tens of thousands of Major U.S. Professional Sports Leagues trading cards buyers across the United States.

184.    **Commonality.** There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual members of the Classes. These common questions of law and fact include, without limitation:

    a.    Whether the market for all Major U.S. Professional Sports Leagues trading cards constitutes a relevant product market for antitrust purposes;

    b.    Whether the Mass Market trading cards for Major U.S. Professional Sports Leagues and Premium trading cards for Major U.S. Professional Sports Leagues constitute relevant submarkets for antitrust purposes;

    c.    Whether Mass Market and Premium Market for each of (1) MLB player trading cards; (2) NBA player trading cards; and (3) NFL player trading cards, respectively,

constitute relevant submarkets for antitrust purposes;

d.  Whether the United States constitutes the relevant geographic market for antitrust purposes;

e.  Whether Fanatics possesses monopoly power in the relevant product and geographic markets;

f.  Whether Fanatics monopolized or attempted to monopolize the Relevant Markets in violation of Section 2 of the Sherman Act;

g.  Whether Fanatics' long-term exclusive contracts with the Professional Sports League Defendants unreasonably restrain trade and substantially foreclose competition in the Relevant Markets in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act;

h.  Whether Fanatics' acquisition of a controlling stake in GCP has substantially lessened competition (and will continue to lessen competition) in the Relevant Markets in violation of Section 7 of the Clayton Act;

i.  Whether Fanatics' acquisition of Topps has substantially lessened competition (and will continue to lessen competition) in the Relevant Markets in violation of Section 7 of the Clayton Act;

j.  Whether the alleged conduct violated state antitrust, unfair competition, and/or consumer protection laws;

k.  Whether Defendants unjustly enriched themselves to the detriment of Plaintiffs and the Classes, thereby entitling Plaintiffs and Class members to disgorgement of all benefits derived by Defendants;

l.  Whether the conduct of Defendants, as alleged in this Complaint, caused injury to

Plaintiffs and Class members;

m. The effect of Defendants' alleged conduct on the price of Pro Sports Trading Cards produced and sold by Fanatics during the Class Period;

n. The appropriate class-wide measure of damages;

o. Whether Plaintiffs are entitled to declaratory relief and injunctive relief to end Defendants' conduct; and

p. Whether Plaintiffs and members of the Classes are entitled to damages and other relief.

185. **Typicality.** Plaintiffs' claims are typical of those of other members of the Classes because Plaintiffs, like every other member of the Classes, was harmed by way of the anticompetitive conduct alleged herein. Plaintiffs, like all other members of the Classes, were injured by Defendants' uniform conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other members of the Classes, such that there are no defenses unique to Plaintiffs. The claims of the Plaintiffs and those of the other members of the Classes arise from the same operative facts and are based on the same legal theories.

186. **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of members of the Classes in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Classes. The damages and infringement of rights the Plaintiffs suffered are typical of other members of the Classes, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the  Classes. Plaintiffs have retained counsel experienced in antitrust class action litigation, and Plaintiffs intend to prosecute this action vigorously.

187. **Superiority of Class Action.** A class action is superior to other available

methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual members of the Classes, and certification as a class action will preserve judicial resources by allowing the Classes' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Classes will remain unaware of the claims they may possess.

188.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of members of the Classes demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

189.    **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

190.    This proposed class action does not present any unique management difficulties.

## IX.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Monopolization in Violation of Section 2 of the Sherman Act
(Against Fanatics)
(On behalf of Nationwide Class for Injunctive Relief)**

191.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

192.    The relevant product market is the market for newly issued, fully licensed Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium), or alternatively the MLB player trading cards market, the NFL player trading cards market, and the NBA player trading cards market (both Mass Market and Premium). The relevant

geographic market is the United States.

193.    Fanatics' anticompetitive conduct has caused Fanatics to acquire and maintain a monopoly of the overall market for Major U.S. Professional Sports Leagues trading cards, and each of the MLB player, NBA player, and NFL player trading cards markets (both Mass Market and Premium markets for each League), each of which constitutes a substantial part of interstate commerce.

194.    Fanatics has the power to control prices in and/or to exclude competition from the Relevant Markets, resulting in monopoly power in each of the markets.

195.    These monopolies and their maintenance are not due to superior products, business acumen, or historic accident, and instead result from Fanatics' anticompetitive conduct.

196.    Fanatics' anticompetitive conduct unreasonably restrains competition and creates insurmountable barriers to entry. There are no procompetitive benefits that justify Fanatics' anticompetitive conduct.

197.    Fanatics' anticompetitive conduct affects a substantial portion of interstate commerce.

198.    Plaintiffs and members of the Classes have been injured in their business or property by Fanatics' antitrust violation. That injury consists of paying higher prices for Pro Sports Trading Cards produced by Fanatics than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics' conduct unlawful.

199.    Plaintiffs and members of the Classes continue to pay higher prices today for

Pro Sports Trading Cards produced by Fanatics than they would have paid in the absence of Fanatics' antitrust violation and are threatened with future injury to their business and property by reason of Fanatics' continuing violation of Section 2 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

<u>**SECOND CAUSE OF ACTION**</u>
**Attempted Monopolization in Violation of Section 2 of the Sherman Act**
**(Against Fanatics)**
**(On behalf of Nationwide Class for Injunctive Relief)**

200.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

201.    The relevant product market is the market for newly issued, fully licensed Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium), or alternatively the MLB player trading cards market, the NFL player trading cards market, and the NBA player trading cards market (both Mass Market and Premium). The relevant geographic market is the United States.

202.    Fanatics, through its anticompetitive conduct and the constituent acts of that conduct, willfully attempted, continues to attempt, and specifically intends to monopolize the overall market for Major U.S. Professional Sports Leagues trading cards, and each of the MLB player, NBA player, and NFL player trading cards markets (both Mass Market and Premium markets for each League). Fanatics has a dangerous probability of success in monopolizing each of these markets, each of which constitutes a substantial part of interstate commerce. This probability is not due to superior products, business acumen, or historic accident, and instead results from its anticompetitive conduct and the constituent acts of that conduct, none of which constitute competition on the merits.

203.    Fanatics' anticompetitive conduct unreasonably restrains competition and creates insurmountable barriers to entry. There are no procompetitive justifications to redeem

them.

204.    Fanatics' anticompetitive conduct affects a substantial portion of interstate commerce.

205.    Plaintiffs and members of the Classes have been injured in their business or property by Fanatics' antitrust violation. That injury consists of paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics' conduct unlawful.

206.    Plaintiffs and members of the Classes continue to pay higher prices today for Pro Sports Trading Cards than they would have paid in the absence of Fanatics' antitrust violation and are threatened with future injury to their business and property by reason of Fanatics' continuing violation of Section 2 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

### THIRD CAUSE OF ACTION
**Violation of Section 7 of the Clayton Act**
**(Against Fanatics)**
**(On behalf of Nationwide Class for Injunctive Relief)**

207.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

208.    The effect of Fanatics' acquisition of a controlling stake of GCP has substantially lessened, and will continue to substantially lessen competition or to tend to create a monopoly in the Relevant Markets in violation of Section 7 of the Clayton Act.

209.    Fanatics' acquiring control over GCP directly threatens, and has already been used to undermine, the competitive viability of its chief competitor in the Relevant Markets, Panini, and there are no procompetitive justifications to redeem it.

210.    Consumers like Plaintiffs and the members of the Classes have suffered losses

reflecting the anticompetitive effect of Fanatics' acquisition of control over GCP, including reduced access to Pro Sports Trading Cards and reduced and delayed Pro Sports Trading Cards releases.

211.    Fanatics' acquisition of GCP has affected a substantial portion of interstate commerce.

212.    Consumers like Plaintiffs and the members of the Classes have suffered competitive injury in the Relevant Markets and an injury of the type that the antitrust laws were intended to prevent and are efficient and appropriate enforcers of the antitrust laws here.

213.    Consumers like Plaintiffs and the members of the Classes are entitled to relief at least in the form of divestiture.

**FOURTH CAUSE OF ACTION**
**Violation of Section 7 of the Clayton Act**
**(Against Fanatics)**
**(On behalf of Nationwide Class for Injunctive Relief)**

214.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

215.    The effect of Fanatics' acquisition of Topps has been and will continue to be, to substantially lessen competition or to tend to create a monopoly in the Relevant Markets alleged in the United States in violation of Section 7 of the Clayton Act.

216.    Fanatics' acquiring Topps has eliminated one critical way that a new entrant might obtain a license as a foothold into the Relevant Markets, and there are no procompetitive justifications to redeem it.

217.    Consumers like Plaintiffs and the members of the Classes have suffered losses reflecting the anticompetitive effect of Fanatics' acquisition of Topps, including increased barriers to entry in the Relevant Markets and foreclosed competition in and for the Relevant Markets for decades.

218.    Fanatics' acquisition of Topps has affected a substantial portion of interstate commerce.

219.    Consumers like Plaintiffs and the members of the Classes have suffered competitive injury in the Relevant Markets and an injury of the type that the antitrust laws were intended to prevent and are efficient and appropriate enforcers of the antitrust laws here.

220.    Consumers like Plaintiffs and the members of the Classes are entitled to relief at least in the form of divestiture.

**FIFTH CAUSE OF ACTION**
**Violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act**
**(Against Fanatics, MLB, and MLBP)**
**(On behalf of Nationwide Class for Injunctive Relief)**

221.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

222.    Fanatics entered into long-term exclusive contracts with the MLB and the entity responsible for licensing the names, marks, and logos of each of the MLB's teams, the MLBP.

223.    Fanatics' long-term exclusive agreement with the MLB and MLBP unreasonably restrains trade and substantially forecloses competition in the Relevant Markets.

224.    Defendants cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

225.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Fanatics, MLB, and MLBP's antitrust violation. That injury consists of paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics, MLB, and MLP's conduct unlawful.

226.    Plaintiffs and members of the Classes continue to pay higher prices today for

Pro Sports Trading Cards than they would have paid in the absence of Fanatics, MLB, and MLBP's antitrust violation and are threatened with future injury to their business and property by reason of Fanatics, MLB, and MLBP's continuing violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**SIXTH CAUSE OF ACTION**
**Violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act**
**(Against Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI)**
**(On behalf of Nationwide Class for Injunctive Relief)**

227.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

228.    Fanatics entered into long-term exclusive contracts with the MLBPA and the entity responsible for licensing the names, marks, and logos of each of the MLBPA's members, the MLBPI. Fanatics also entered into long-term exclusive contracts with the NFLPA and the entity responsible for licensing the names, marks, and logos of each of the NFLPA's members, the NFLPI.

229.    MLBPA and NFLPA created OneTeam as a joint venture that "specializes in the collective licensing rights of athletes."

230.    When Fanatics announced its exclusive trading card deals with the MLBPA and NFLPA, the Executive Directors of the MLBPA—Tony Clark—and the NFLPA—DeMaurice Smith—said that the deal "never would have happened" if their organizations had not "joined forces to create OneTeam."

231.    Fanatics' long-term exclusive agreements with the MLBPA, the MLBPI, the NFLPA, and the NFLPI unreasonably restrain trade and substantially foreclose competition in the Relevant Markets and in the submarkets for Mass Market and Premium cards for MLB and NFL player trading cards.

232.    Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

233.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI's antitrust violations. That injury consists of paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violations. Plaintiffs and members of the Classes' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI's conduct unlawful.

234.    Plaintiffs and members of the Classes continue to pay higher prices today for Pro Sports Trading Cards than they would have paid in the absence of Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI's antitrust violations and are threatened with future injury to their business and property by reason of Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI's continuing violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**SEVENTH CAUSE OF ACTION**
**Violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act**
**(Against Fanatics, NFL, and NFLP)**
**(On behalf of Nationwide Class for Injunctive Relief)**

235.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

236.    Fanatics entered into long-term exclusive contracts with the NFL and the entity responsible for licensing the names, marks, and logos of each of the NFL's teams, the NFLP.

237.    Fanatics' long-term exclusive agreement with the NFL and NFLP unreasonably restrains trade and substantially forecloses competition in the Relevant Markets and in the

submarkets for Mass Market and Premium cards for NFL player trading cards.

238.    Fanatics, NFL, and NFLP cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

239.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Fanatics, NFL, and NFLP's antitrust violation. That injury consists of paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics, NFL, and NFLP's conduct unlawful.

240.    Plaintiffs and members of the Classes continue to pay higher prices today for Pro Sports Trading Cards than they would have paid in the absence of Fanatics, NFL, and NFLP's antitrust violation and are threatened with future injury to their business and property by reason of Fanatics, NFL, and NFLP's continuing violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## EIGHTH CAUSE OF ACTION
### Violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act
### (Against Fanatics, NBA, and NBAP)
### (On behalf of Nationwide Class for Injunctive Relief)

241.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

242.    Fanatics entered into long-term exclusive contracts with the NBA and NBAP, the entity responsible for licensing the names, marks, and logos of each of the NBA's teams.

243.    Fanatics' long-term exclusive agreement with the NBA and NBAP unreasonably restrains trade and substantially forecloses competition in the Relevant Markets and in the submarkets for Mass Market and Premium cards for NBA player trading cards.

244.    Fanatics, NBA, and NBAP cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

245.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Fanatics, NBA, and NBAP's antitrust violation. That injury consists of paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics, NBA, and NBAP's conduct unlawful.

246.    Plaintiffs and members of the Classes continue to pay higher prices today for Pro Sports Trading Cards than they would have paid in the absence of Fanatics, NBA, and NBAP's antitrust violation and are threatened with future injury to their business and property by reason of Fanatics, NBA, and NBAP's continuing violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## NINTH CAUSE OF ACTION
### Violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act
### (Against Fanatics and NBPA)
### (On behalf of Nationwide Class for Injunctive Relief)

247.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

248.    Fanatics entered into long-term exclusive contracts with the NBPA.

249.    Fanatics' long-term exclusive agreement with the NBPA unreasonably restrains trade and forecloses competition in the Relevant Markets and in the submarkets for Mass Market and Premium cards for NBA player trading cards.

250.    Fanatics and NBPA cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

251.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Fanatics and NBPA's antitrust violation. That injury consists of paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Classes' injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Fanatics and NBPA's conduct unlawful.

252.    Plaintiffs and members of the Classes continue to pay higher prices today for Pro Sports Trading Cards than they would have paid in the absence of Fanatics and NBAP's antitrust violation and are threatened with future injury to their business and property by reason of Fanatics and NBPA's continuing violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

### TENTH CAUSE OF ACTION
**Monopolization under State Antitrust Law**
**(Against Fanatics)**
**(On behalf of the Damages Class)**

253.    Plaintiffs assert these state law claims on behalf of the Damages Class.

254.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

255.    The relevant product market is the market for newly issued, fully licensed Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium), or alternatively the MLB player trading cards market, the NFL player trading cards market, and the NBA player trading cards market (both Mass Market and Premium). The relevant geographic market is the United States.

256.    Fanatics' anticompetitive conduct has caused Fanatics to acquire and maintain a monopoly of the overall market for Pro Sports Trading Cards (both Mass Market and

Premium), and each of the MLB player, NBA player, and NFL player trading cards markets (both Mass Market and Premium), each of which constitutes a substantial part of interstate commerce.

257.    Fanatics has the power to control prices in and/or to exclude competition from the Relevant Markets, resulting in monopoly power in each of the markets.

258.    These monopolies and their maintenance are not due to superior products, business acumen, or historic accident, and instead result from Fanatics' anticompetitive conduct.

259.    Fanatics' anticompetitive conduct unreasonably restrains competition and creates insurmountable barriers to entry. There are no procompetitive justifications to redeem this conduct.

260.    In each of the following jurisdictions, Fanatics' monopoly had the following effects: (1) price competition for Pro Sports Trading Cards was restrained, suppressed, and eliminated; (2) prices for Pro Sports Trading Cards were raised, fixed, maintained and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Pro Sports Trading Cards

261.    During the Class Period, Fanatics' illegal conduct substantially affected commerce in each of states set forth below.

262.    By reason of the foregoing, Fanatics has violated, and Plaintiffs and members of the Damages Class are entitled to relief under:

    a.    Arizona, Ariz. Rev. Stat., §§ 44-1401, *et seq*.

    b.    California, Cartwright Act, Cal. Bus. & Prof. Code, §§ 16700, *et seq.*

c.  Colorado, Colo. Rev. Stat. Ann. §§ 6-4-101, *et seq*.

d.  Connecticut, Conn. Stat. Ann. §§ 35-24, *et seq*.

e.  District of Columbia, D.C. Code Ann. §§ 28-4501, *et seq.*

f.  Hawai'i, Haw. Rev. Stat. Ann. §§ 480-4, *et seq*.

g.  Illinois, 740 Ill. Comp. Stat. Ann., §§ 10/1, *et seq*.

h.  Iowa, Iowa Code Ann. §§ 553.1, *et seq*.

i.  Kansas, Kan. Stat. Ann., §§ 50-101, *et seq*.

j.  Maine, Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

k.  Maryland, Md. Code Ann., Com. Law §§ 11-201, *et seq*.

l.  Michigan, Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

m.  Minnesota, Minn. Stat. Ann. §§ 325D.49, *et seq*.

n.  Mississippi, Miss. Code Ann. §§ 75-21-1, *et seq*.

o.  Nebraska, Neb. Rev. Stat. §§ 59-801, *et seq.*

p.  Nevada, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

q.  New Hampshire, N.H. Rev. Stat. tit. XXXI, §§ 356:1, *et seq*.

r.  New Jersey, N.J. Stat. Ann. §§ 56:9-1, *et seq*.

s.  New Mexico, N.M. Stat. Ann. §§ 57-1-1, *et seq*.

t.  New York, N.Y. Gen. Bus. Law §§ 340, *et seq*.

u.  North Carolina, N.C. Gen. Stat. Ann. §§ 75-1, *et. seq*.

v.  North Dakota, N.D. Cent. Code §§ 51-08.1-01, *et seq.*

w.  Oregon, Or. Rev. Stat. §§ 646.705, *et seq.*

x.  Puerto Rico, P.R. Laws Ann. tit. 10 §§ 258, *et seq*

y.  Rhode Island, R.I. Gen. Laws §§ 6-36-1, *et seq*.

z.   South Dakota, S.D. Codified Laws §§ 37-1-1, *et seq.*

aa.  Tennessee, Tenn. Code Ann. §§ 47-25-101, *et seq.*

bb.  Utah, Utah Code Ann. §§ 76-10-3101, *et seq.*

cc.  West Virginia, W. Va. Code §§ 47-18-1, *et seq.*

dd.  Wisconsin, Wis. Stat. Ann. §§ 133.01, *et seq.*

263.    Fanatics has profited significantly from the aforesaid anticompetitive conduct. Fanatics' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

264.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## ELEVENTH CAUSE OF ACTION
### Unreasonable Restraint of Trade under State Law
### (Against Fanatics, MLB, and MBLP)
### (On behalf of the Damages Class)

265.    Plaintiffs assert these state law claims on behalf of the Damages Class.

266.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

267.    Fanatics entered into long-term exclusive contracts with the MLB and the entity responsible for licensing the names, marks, and logos of each of the MLB's teams, the MLBP. Fanatics' long-term exclusive agreement with the MLB and MLBP unreasonably restrains trade and forecloses competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for MLB player trading cards.

268.    Fanatics, MLB, and MLBP cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

62

269.     In each of the following jurisdictions, Fanatics, MLB, and MLBP's exclusive contracts had the following effects: (1) price competition for MLB player trading cards was restrained, suppressed, and eliminated; (2) prices for MLB player trading cards were raised, fixed, maintained and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for MLB player trading cards.

270.     During the Class Period, Fanatics, MLB, and MLBP's exclusive contracts substantially affected commerce in each of the states set forth below.

271.     By reason of the foregoing, Fanatics has violated, and Plaintiffs and members of the Damages Class are entitled to relief under:

    a.     Arizona, Ariz. Rev. Stat., §§ 44-1401, *et seq*.

    b.     California, Cartwright Act, Cal. Bus. & Prof. Code, §§ 16700, *et seq.*

    c.     Colorado, Colo. Rev. Stat. Ann. §§ 6-4-101, *et seq*.

    d.     Connecticut, Conn. Stat. Ann. §§ 35-24, *et seq*.

    e.     District of Columbia, D.C. Code Ann. §§ 28-4501, *et seq.*

    f.     Hawai'i, Haw. Rev. Stat. Ann. §§ 480-4, *et seq*.

    g.     Illinois, 740 Ill. Comp. Stat. Ann., §§ 10/1, *et seq*.

    h.     Iowa, Iowa Code Ann. §§ 553.1, *et seq*.

    i.     Kansas, Kan. Stat. Ann., §§ 50-101, *et seq*.

    j.     Maine, Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*

    k.     Maryland, Md. Code Ann., Com. Law §§ 11-201, *et seq*.

    l.     Michigan, Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

    m.  Minnesota, Minn. Stat. Ann. §§ 325D.49, *et seq.*

    n.  Mississippi, Miss. Code Ann. §§ 75-21-1, *et seq.*

    o.  Nebraska, Neb. Rev. Stat. §§ 59-801, *et seq.*

    p.  Nevada, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

    q.  New Hampshire, N.H. Rev. Stat. tit. XXXI, §§ 356:1, *et seq.*

    r.  New Jersey, N.J. Stat. Ann. §§ 56:9-1, *et seq.*

    s.  New Mexico, N.M. Stat. Ann. §§ 57-1-1, *et seq.*

    t.  New York, N.Y. Gen. Bus. Law §§ 340, *et seq.*

    u.  North Carolina, N.C. Gen. Stat. Ann. §§ 75-1, *et. seq.*

    v.  North Dakota, N.D. Cent. Code §§ 51-08.1-01, *et seq.*

    w.  Oregon, Or. Rev. Stat. §§ 646.705, *et seq.*

    x.  Puerto Rico, P.R. Laws Ann. tit. 10 §§ 258, *et seq*

    y.  Rhode Island, R.I. Gen. Laws §§ 6-36-1, *et seq.*

    z.  South Dakota, S.D. Codified Laws §§ 37-1-1, *et seq.*

    aa. Tennessee, Tenn. Code Ann. §§ 47-25-101, *et seq.*

    bb. Utah, Utah Code Ann. §§ 76-10-3101, *et seq.*

    cc. West Virginia, W. Va. Code §§ 47-18-1, *et seq.*

    dd. Wisconsin, Wis. Stat. Ann. §§ 133.01, *et seq.*

272.    Fanatics, MLB, and MLBP have profited significantly from the aforesaid conspiracy. Fanatics, MLB, and MLBP's profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

273.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## TWELFTH CAUSE OF ACTION
### Unreasonable Restraint of Trade under State Law
### (Against Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI)
### (On behalf of the Damages Class)

274. Plaintiffs assert these state law claims on behalf of the Damages Class.

275. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

276. Fanatics entered into long-term exclusive contracts with the MLBPA and the entity responsible for licensing the names, marks, and logos of each of the MLBPA's members, the MLBPI. Fanatics also entered into long-term exclusive contracts with the NFLPA and the entity responsible for licensing the names, marks, and logos of each of the NFLPA's members, the NFLPI.

277. MLBPA and NFLPA created OneTeam as a joint venture which "specializes in the collective licensing rights of athletes."

278. When Fanatics announced it exclusive trading card deals with the MLBPA and NFLPA, the Executive Directors of the MLBPA—Tony Clark—and the NFLPA—DeMaurice Smith—said that the deal "never would have happened" if their organizations had not "joined forces to create OneTeam."

279. Fanatics' long-term exclusive agreements with the MLBPA, the MLBPI, the NFLPA, and the NFLPI unreasonably restrain trade and foreclose competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for MLB and NFL player trading cards.

280. Defendants cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

281.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violation. That injury consists of paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Damages Class's injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

282.    By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Damages Class are entitled to relief under:

    a.  Arizona, Ariz. Rev. Stat., §§ 44-1401, *et seq*.

    b.  California, Cartwright Act, Cal. Bus. & Prof. Code, §§ 16700, *et seq.*

    c.  Colorado, Colo. Rev. Stat. Ann. §§ 6-4-101, *et seq*.

    d.  Connecticut, Conn. Stat. Ann. §§ 35-24, *et seq*.

    e.  District of Columbia, D.C. Code Ann. §§ 28-4501, *et seq.*

    f.  Hawai'i, Haw. Rev. Stat. Ann. §§ 480-4, *et seq*.

    g.  Illinois, 740 Ill. Comp. Stat. Ann., §§ 10/1, *et seq*.

    h.  Iowa, Iowa Code Ann. §§ 553.1, *et seq*.

    i.  Kansas, Kan. Stat. Ann., §§ 50-101, *et seq*.

    j.  Maine, Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

    k.  Maryland, Md. Code Ann., Com. Law §§ 11-201, *et seq*.

    l.  Michigan, Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

    m.  Minnesota, Minn. Stat. Ann. §§ 325D.49, *et seq*.

    n.  Mississippi, Miss. Code Ann. §§ 75-21-1, *et seq*.

    o.  Nebraska, Neb. Rev. Stat. §§ 59-801, *et seq.*

    p.  Nevada, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

    q.  New Hampshire, N.H. Rev. Stat. tit. XXXI, §§ 356:1, *et seq.*

    r.  New Jersey, N.J. Stat. Ann. §§ 56:9-1, *et seq.*

    s.  New Mexico, N.M. Stat. Ann. §§ 57-1-1, *et seq*.

    t.  New York, N.Y. Gen. Bus. Law §§ 340, *et seq.*

    u.  North Carolina, N.C. Gen. Stat. Ann. §§ 75-1, *et. seq.*

    v.  North Dakota, N.D. Cent. Code §§ 51-08.1-01, *et seq.*

    w.  Oregon, Or. Rev. Stat. §§ 646.705, *et seq.*

    x.  Puerto Rico, P.R. Laws Ann. tit. 10 §§ 258, *et seq*

    y.  Rhode Island, R.I. Gen. Laws §§ 6-36-1, *et seq.*

    z.  South Dakota, S.D. Codified Laws §§ 37-1-1, *et seq.*

    aa. Tennessee, Tenn. Code Ann. §§ 47-25-101, *et seq.*

    bb. Utah, Utah Code Ann. §§ 76-10-3101, *et seq.*

    cc. West Virginia, W. Va. Code §§ 47-18-1, *et seq.*

    dd. Wisconsin, Wis. Stat. Ann. §§ 133.01, *et seq.*

283.    Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI have profited significantly from the aforesaid conspiracy. Fanatics, OneTeam, MLBPA, MLBPI, NFLPA, and NFLPI's profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

284.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRTEENTH CAUSE OF ACTION
### Unreasonable Restraint of Trade under State Law
### (Against Fanatics, NFL, and NFLP)
### (On behalf of the Damages Class)

285.    Plaintiffs assert these state law claims on behalf of the Damages Class.

286.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

287.    Fanatics entered into long-term exclusive contracts with the NFL and the entity responsible for licensing the names, marks, and logos of each of the NFL's teams, the NFLP.

288.    Fanatics' long-term exclusive agreement with the NFL and NFLP unreasonably restrains trade and forecloses competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for NFL player trading cards.

289.    Defendants cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

290.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violation. That injury consists of paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Damages Class's injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

291.    By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Damages Class are entitled to relief under:

    a.    Arizona, Ariz. Rev. Stat., §§ 44-1401, *et seq.*

    b.    California, Cartwright Act, Cal. Bus. & Prof. Code, §§ 16700, *et seq.*

    c.    Colorado, Colo. Rev. Stat. Ann. §§ 6-4-101, *et seq.*

    d.    Connecticut, Conn. Stat. Ann. §§ 35-24, *et seq.*

e.  District of Columbia, D.C. Code Ann. §§ 28-4501, *et seq.*

f.  Hawai'i, Haw. Rev. Stat. Ann. §§ 480-4, *et seq*.

g.  Illinois, 740 Ill. Comp. Stat. Ann., §§ 10/1, *et seq*.

h.  Iowa, Iowa Code Ann. §§ 553.1, *et seq*.

i.  Kansas, Kan. Stat. Ann., §§ 50-101, *et seq*.

j.  Maine, Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

k.  Maryland, Md. Code Ann., Com. Law §§ 11-201, *et seq*.

l.  Michigan, Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

m.  Minnesota, Minn. Stat. Ann. §§ 325D.49, *et seq*.

n.  Mississippi, Miss. Code Ann. §§ 75-21-1, *et seq*.

o.  Nebraska, Neb. Rev. Stat. §§ 59-801, *et seq*.

p.  Nevada, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

q.  New Hampshire, N.H. Rev. Stat. tit. XXXI, §§ 356:1, *et seq*.

r.  New Jersey, N.J. Stat. Ann. §§ 56:9-1, *et seq*.

s.  New Mexico, N.M. Stat. Ann. §§ 57-1-1, *et seq*.

t.  New York, N.Y. Gen. Bus. Law §§ 340, *et seq*.

u.  North Carolina, N.C. Gen. Stat. Ann. §§ 75-1, *et. seq.*

v.  North Dakota, N.D. Cent. Code §§ 51-08.1-01, *et seq.*

w.  Oregon, Or. Rev. Stat. §§ 646.705, *et seq.*

x.  Puerto Rico, P.R. Laws Ann. tit. 10 §§ 258, *et seq*

y.  Rhode Island, R.I. Gen. Laws §§ 6-36-1-1, *et seq*.

z.  South Dakota, S.D. Codified Laws §§ 37-1, *et seq*.

aa.  Tennessee, Tenn. Code Ann. §§ 47-25-101, *et seq*.

bb. Utah, Utah Code Ann. §§ 76-10-3101, *et seq.*

cc. West Virginia, W. Va. Code §§ 47-18-1, *et seq.*

dd. Wisconsin, Wis. Stat. Ann. §§ 133.01, *et seq.*

292.    Fanatics, NFL, and NFLP have profited significantly from the aforesaid conspiracy. Fanatics, NFL, and NFLP's profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

293.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## FOURTEENTH CAUSE OF ACTION
### Unreasonable Restraint of Trade under State Law
### (Against Fanatics, NBA, and NBAP)
### (On behalf of the Damages Class)

294.    Plaintiffs assert these state law claims on behalf of the Damages Class.

295.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

296.    Fanatics entered into long-term exclusive contracts with the NBA and the entity responsible for licensing the names, marks, and logos of each of the NBA's teams, the NBAP.

297.    Fanatics' long-term exclusive agreement with the NBA and NBAP unreasonably restrains trade and forecloses competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for NBA player trading cards.

298.    Defendants cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

299.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violation. That injury consists of

paying higher prices for Pro Sports Trading Cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Damages Class's injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

300.     By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Damages Class are entitled to relief under:

    a.  Arizona, Ariz. Rev. Stat., §§ 44-1401, *et seq*.

    b.  California, Cartwright Act, Cal. Bus. & Prof. Code, §§ 16700, *et seq.*

    c.  Colorado, Colo. Rev. Stat. Ann. §§ 6-4-101, *et seq*.

    d.  Connecticut, Conn. Stat. Ann. §§ 35-24, *et seq*.

    e.  District of Columbia, D.C. Code Ann. §§ 28-4501, *et seq*.

    f.  Hawai'i, Haw. Rev. Stat. Ann. §§ 480-4, *et seq*.

    g.  Illinois, 740 Ill. Comp. Stat. Ann., §§ 10/1, *et seq*.

    h.  Iowa, Iowa Code Ann. §§ 553.1, *et seq*.

    i.  Kansas, Kan. Stat. Ann., §§ 50-101, *et seq*.

    j.  Maine, Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

    k.  Maryland, Md. Code Ann., Com. Law §§ 11-201, *et seq*.

    l.  Michigan, Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

    m.  Minnesota, Minn. Stat. Ann. §§ 325D.49, *et seq*.

    n.  Mississippi, Miss. Code Ann. §§ 75-21-1, *et seq*.

    o.  Nebraska, Neb. Rev. Stat. §§ 59-801, *et seq.*

    p.  Nevada, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

    q.  New Hampshire, N.H. Rev. Stat. tit. XXXI, §§ 356:1, *et seq*.

r.   New Jersey, N.J. Stat. Ann. §§ 56:9-1, *et seq.*

s.   New Mexico, N.M. Stat. Ann. §§ 57-1-1, *et seq.*

t.   New York, N.Y. Gen. Bus. Law §§ 340, *et seq.*

u.   North Carolina, N.C. Gen. Stat. Ann. §§ 75-1, *et. seq.*

v.   North Dakota, N.D. Cent. Code §§ 51-08.1-01, *et seq.*

w.   Oregon, Or. Rev. Stat. §§ 646.705, *et seq.*

x.   Puerto Rico, P.R. Laws Ann. tit. 10 §§ 258, *et seq*

y.   Rhode Island, R.I. Gen. Laws §§ 6-36-1, *et seq.*

z.   South Dakota, S.D. Codified Laws §§ 37-1-1, *et seq.*

aa.  Tennessee, Tenn. Code Ann. §§ 47-25-101, *et seq.*

bb.  Utah, Utah Code Ann. §§ 76-10-3101, *et seq.*

cc.  West Virginia, W. Va. Code §§ 47-18-1, *et seq.*

dd.  Wisconsin, Wis. Stat. Ann. §§ 133.01, *et seq.*

301.   Fanatics, NBA, and NBAP have profited significantly from the aforesaid conspiracy. Fanatics, NBA, and NBAP's profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

302.   Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### FIFTEENTH CAUSE OF ACTION
**Unreasonable Restraint of Trade under State Law**
**(Against Fanatics and NBPA)**
**(On behalf of the Damages Class)**

303.   Plaintiffs assert these state law claims on behalf of the Damages Class.

304.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

305.    Fanatics entered into long-term exclusive contracts with the NBPA.

306.    Fanatics' long-term exclusive agreement with the NBAPA unreasonably restrains trade and forecloses competition in the Relevant Market and in the submarkets for Mass Market and Premium cards for NBA player trading cards.

307.    Defendants cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers.

308.    As a result of the long-term exclusive agreement, consumers have suffered injury and damages that flow from Defendants' antitrust violation. That injury consists of paying higher prices for trading cards than would have been paid in the absence of the antitrust violation. Plaintiffs and members of the Damages Class's injuries are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

309.    By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Damages Class are entitled to relief under:

a.    Arizona, Ariz. Rev. Stat., §§ 44-1401, *et seq*.

b.    California, Cartwright Act, Cal. Bus. & Prof. Code, §§ 16700, *et seq.*

c.    Colorado, Colo. Rev. Stat. Ann. §§ 6-4-101, *et seq*.

d.    Connecticut, Conn. Stat. Ann. §§ 35-24, *et seq*.

e.    District of Columbia, D.C. Code Ann. §§ 28-4501, *et seq.*

f.    Hawai'i, Haw. Rev. Stat. Ann. §§ 480-4, *et seq*.

g.    Illinois, 740 Ill. Comp. Stat. Ann., §§ 10/1, *et seq*.

h.    Iowa, Iowa Code Ann. §§ 553.1, *et seq*.

    i.    Kansas, Kan. Stat. Ann., §§ 50-101, *et seq*.

    j.    Maine, Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

    k.    Maryland, Md. Code Ann., Com. Law §§ 11-201, *et seq*.

    l.    Michigan, Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

    m.    Minnesota, Minn. Stat. Ann. §§ 325D.49, *et seq*.

    n.    Mississippi, Miss. Code Ann. §§ 75-21-1, *et seq*.

    o.    Nebraska, Neb. Rev. Stat. §§ 59-801, *et seq*.

    p.    Nevada, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

    q.    New Hampshire, N.H. Rev. Stat. tit. XXXI, §§ 356:1, *et seq*.

    r.    New Jersey, N.J. Stat. Ann. §§ 56:9-1, *et seq*.

    s.    New Mexico, N.M. Stat. Ann. §§ 57-1-1, *et seq*.

    t.    New York, N.Y. Gen. Bus. Law §§ 340, *et seq*.

    u.    North Carolina, N.C. Gen. Stat. Ann. §§ 75-1, *et. seq*.

    v.    North Dakota, N.D. Cent. Code §§ 51-08.1-01, *et seq*.

    w.    Oregon, Or. Rev. Stat. §§ 646.705, *et seq*.

    x.    Puerto Rico, P.R. Laws Ann. tit. 10 §§ 258, *et seq*

    y.    Rhode Island, R.I. Gen. Laws §§ 6-36-1, *et seq*.

    z.    South Dakota, S.D. Codified Laws §§ 37-1-1, *et seq*.

    aa.    Tennessee, Tenn. Code Ann. §§ 47-25-101, *et seq*.

    bb.    Utah, Utah Code Ann. §§ 76-10-3101, *et seq*.

    cc.    West Virginia, W. Va. Code §§ 47-18-1, *et seq*.

    dd.    Wisconsin, Wis. Stat. Ann. §§ 133.01, *et seq*.

310.    Fanatics and NBPA have profited significantly from the aforesaid conspiracy.

Fanatics and NBPA's profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

311.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

<u>**SIXTEENTH CAUSE OF ACTION**</u>
**Unfair and Deceptive Trade Practices**
**(Against All Defendants)**
**(On behalf of the Damages Class)**

312.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

313.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the following state laws:

a.    Arkansas, Ark. Code Ann. §§ 4-88-101, *et seq.*

b.    California, California Bus & Prof. Code §§ 17200, *et seq.*

c.    District of Columbia, D.C. Code §§ 28-3901, *et seq.*

d.    Florida, Fla. Stat. §§ 501.201, *et seq.*

e.    Hawai'i, Haw. Rev. Stat. §§ 480-2, *et seq.*

f.    Maine, Me. Rev. Stat. tit. 5, §§ 205A, *et seq.*

g.    Massachusetts, Mass. Gen. Laws, ch. 93A §§ 1, *et seq.*

h.    Missouri, Mo. Rev. Stat. §§ 407.010, *et seq.*

i.    Montana, Mont. Code, §§ 30-14-101, *et seq.*

j.    Nebraska, Neb. Rev. Stat. §§ 59-1601, *et seq.*

k.    New Hampshire, N.H. Rev. Ann. tit. XXXI, §§ 358-A:1, *et seq.*

l.    New Mexico, N.M. Stat. §§ 57-12-1, *et seq.*

m.  New York, N.Y. Gen. Bus. Law §§ 349, *et seq.*

n.  North Carolina, N.C. Gen. Stat. §§ 75-1.1, *et seq.*

o.  Oregon, Or. Rev. Stat. §§ 646.605, *et seq.*

p.  Rhode Island, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

q.  South Carolina, S.C. Code Ann. §§ 39-5-10, *et seq.*

r.  Vermont, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*

314.    In each of the preceding jurisdictions, Defendants' unlawful conduct had the following effects: (1) price competition for Pro Sports Trading Cards was restrained, suppressed, and eliminated; (2) prices for Pro Sports Trading Cards were raised, fixed, maintained and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Pro Sports Trading Cards.

## SEVENTEENTH CAUSE OF ACTION
### Unjust Enrichment
### (Against Fanatics)
### (On behalf of the Damages Class for Restitution)

315.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

316.    Plaintiffs bring this claim under the laws of all states listed in Tenth–Sixteenth Causes of Action, *supra*.

317.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Pro Sports Trading Cards.

318.    Defendants have benefited from their unlawful acts, and it would be inequitable

76

for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and members of the Damages Class for Pro Sports Trading Cards.

319.    Plaintiffs and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis.

320.    Pursuit of any remedies against the firms from which Plaintiffs and members of the Damages Class purchased Pro Sports Trading Cards subject to  Defendants' unlawful conduct would have been futile.

## X.    DEMAND FOR RELIEF

321.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

322.    That the unlawful conduct alleged herein be adjudged and decreed:

a.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

b.    An illegal monopoly and/or attempt to monopolize interstate commerce in violation of Section 2 of the Sherman Act;

c.    An illegal contract in violation of Section 3 of the Clayton Act;

d.    An acquisition lessening competition in violation of Section 7 of the Clayton Act;

e.    An unfair method of competition in violation of the state antitrust and

unfair competition and consumer protection laws as set forth herein; and

    f.   Acts of unjust enrichment by Defendants as set forth herein.

323.    Plaintiffs and members of the Classes recover damages to the maximum extent allowed under such laws, and judgment in favor of Plaintiffs and members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

324.    Plaintiffs and members of the Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

325.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

326.    Plaintiffs and members of the Classes be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

327.    Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

328.    Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

329.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    JURY TRIAL DEMAND

330.    Plaintiffs demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated: August 18, 2025                     Respectfully submitted,

                                        */s/ Alexander W. Cogbill*
Alexander W. Cogbill
**ZELLE LLP**
45 Broadway, Suite 920
New York, NY 10006
Telephone: (646) 876-4420
acogbill@zellelaw.com

Christopher T. Micheletti (*pro hac vice* forthcoming)
Qianwei Fu (*pro hac vice* forthcoming)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

*Counsel for Plaintiffs Sean Auld, Daniel Enriquez, Ryan Meuse, and Edgar Nava*